620 So.2d 372 (1993)
William RISER, Claudette Riser O'Neil, and Patricia Riser Jones, Individually and on Behalf of Their Deceased Mother, Anne Valerie Miranne Riser
v.
AMERICAN MEDICAL INTERNATIONAL, INC., a/k/a AMI, Individually d/b/a and St. Jude Medical Center.
No. 93-CA-153.
Court of Appeal of Louisiana, Fifth Circuit.
May 25, 1993.
*374 R. Ray Orrill, Jr. and Viki A. Williams, New Orleans, for plaintiff/appellee, William Riser, Claudette Riser O'Neil and Patricia Riser Jones, Individually and on Behalf of their Deceased Mother, Anne Valerie Miranne Riser.
William S. Penick, Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, New Orleans, for defendant/appellant, Erich K. Lang, M.D.
Before BOWES, DUFRESNE and WICKER, JJ.
BOWES, Judge.
Defendant, Dr. Erich K. Lang, appeals from a judgment of the trial court which found him liable to plaintiffs for the wrongful death of their mother, Ann Valerie Miranne Riser. We affirm.

FACTS
In May of 1986, the decedent, Mrs. Riser, a 69 year old woman, was admitted to De La Ronde Hospital and placed under the care of Dr. Vikrom Sottiurai, a vascular surgeon. Mrs. Riser suffered from several serious medical conditions, including diabetes mellitus, end-stage renal failure necessitating dialysis, and arteriosclerosis. Mrs. Riser had dialysis shunts in both arms and was experiencing impaired circulation in both lower arms/hands, including manifestations of gangrene in her right index finger. In order to determine the cause of gangrene, the extent of the circulation problems and the possibility of by-pass surgery, Dr. Sottiurai requested bilateral brachial (elbow) arteriograms of both arms. Because DelaRonde Hospital could not accommodate his request, Dr. Sottiurai contacted defendant, Dr. Lang, and on May 29, 1986, Mrs. Riser was transported to St. Jude Medical Center for the procedure. Dr. Lang, however, performed a femoral (thigh) arteriogram which apparently transpired without complications. During the arteriography Dr. Lang obtained images of the blood vessels utilizing both the conventional approach and a new approach called digital subtraction analysis (DSA), which approach utilizes less amounts of contrast material and produces smaller images on a videotape. Mrs. Riser remained under observation for approximately one and onehalf hours after the completion of the arteriogram and was then placed in an ambulance for transport back to De La Ronde Hospital. Shortly after the ambulance departed, Mrs. Riser suffered a grand mal seizure and was returned to St. Jude Hospital. Her condition deteriorated continuously and she died eleven days later.
The cause of death was determined to be a thrombus which lodged at the base of the brain and caused a brain stem infarct (stroke).
The plaintiffs, William Riser, Claudette Riser O'Neil and Patricia Riser Jones, are the major children of the decedent. They filed suit individually and on behalf of their mother, Mrs. Riser, for medical malpractice alleging that the decedent was a "poor risk" for an arteriogram using the femoral approach and was exposed to substantially increased risk of brain injury or infarct as a result and that Mrs. Riser's death was caused by the arteriogram. They also alleged that the arteriogram was performed without the informed consent of either decedent or plaintiffs.
After trial on the merits, the court rendered judgment against Dr. Lang and for plaintiffs as follows:

*375 The defendant is ordered to pay the plaintiffs the following amounts: to William Riser, $100,000.00; to Claudette Riser O'Neil, $100,000.00; and to Patricia Riser Jones, $100,000.00. The defendant is also ordered to pay to the three plaintiffs the sum of $79,656.83 representing hospital expenses, funeral expenses, and compensation for their mother's pain and suffering prior to her death. The total judgment against the defendant in favor of the plaintiffs is $379,656.83, plus interest from date of demand and all costs of these proceedings.
The judgment was subsequently amended to provide that Dr. Lang be not personally liable in excess of $100,000.00.
In his reasons for judgment, the trial judge found as follows:
The evidence establishes that on or about May 29, 1986, the decedent, Anne Valerie Riser, then 69 years of age was being treated by Dr. Vikrom Sottiurai at the Dela Ronde Hospital. The decedent was suffering from serious and varied complications including renal failure and blood circulation problems requiring shunts in both arms and experiencing gangrene on at least one finger. Dr. Sottiurai requested bilateral brachial arteriograms of both upper extremities and had the decedent transferred to St. Jude Medical Center for the procedure. Dr. Erich K. Lang, a radiologist, performed a femoral arteriogram as opposed to a bilateral brachial arteriogram.
The testimony of the plaintiffs in this matter, the children of the decedent, establish that the decedent was strongly opposed to any femoral arteriogram and would not have normally consented to same. The testimony of the witnesses differ as to whether the consent form for the operation was signed by Mrs. Riser's daughter at the insistence of Dr. Lang. The daughter testified that Dr. Lang advised the femoral procedure was necessary in order to save her mother's life and that the mother had not signed the form because she was under sedation. The form submitted to the Court was signed by the daughter and purportedly contained the signature of the mother (decedent) which signature had not been on the document when presented to the daughter. Mrs. Riser, the decedent, when admitted to St. Jude had only agreed to a brachial artery arteriogram as recommended by Dr. Sottiurai.
The testimony further reveals that Mrs. Riser (decedent) had severe cataracts and glaucoma in both eyes and as a result could not see without her glasses. That at the time she was in the St. Jude Hospital, the decedent did not have her glasses with her. The Court is aware that the document could have been read to the decedent but there was no testimony to that effect and therefore the Court refuses to speculate beyond the testimony. Therefore the Court finds, as a matter of fact, that Mrs. Riser, the decedent, did not authorize a femoral arteriogram and that the procedure was without her informed consent.
The Court finds further, as a matter fact (sic), that the result of the procedure would have been of no value to Dr. Sottiurai. That subjecting the patient to a procedure which has a risk of injury and which procedure would be of no benefit to the patient is a breach of the standard of care.
Following the procedure, the decedent remained in the hospital for approximately 2 hours and was then transferred to an ambulance to be returned to the Dela Ronde Hospital. The testimony of the daughter indicated that the decedent was in much distress just prior to being placed in the ambulance which distress was indicated by tremors, glassy-eyes expression, and a scream indicating pain just prior to entering the ambulance. Shortly after the ambulance departed, the decedent experienced a severe seizure and was returned to St. Jude for care. The decedent complained of some pain at the time of exiting from the ambulance, but according to the testimony of the daughter, never spoke again and died some eleven days thereafter.
The cause of death was a thrombus which lodged at the base of the brain and caused a brain stem infarct. Again there *376 was conflicting medical testimony as to the cause of the death i.e., the origin of the thrombus. After weighing all of the testimony, the Court adopts the findings of Dr. Bucklin to the effect that because of the timing of the angiogram and the subsequent catastrophic event, the angiogram was the probable cause of the brain stem infarct.
Therefore, the Court finds that Dr. Lang breached the standard of care required of radiologist in 1986 and is therefore answerable in damages to the plaintiffs.[1]
Defendant has appealed both the finding of liability and quantum, presenting the following issues for review.
1. Did the trial court err in finding that the result of the procedure would have been of no value to decedent and therefore defendant breached the standard of care by performing a procedure which would be of no benefit to the patient.
2. Did the trial court err in finding that decedent had not consented to the procedure.
3. Did the trial court err in finding a causal connection between the procedure and Mrs. Riser's death.
4. Did the trial court err in awarding damages which were excessive.

ANALYSIS
At the onset we reiterate the standard of review by which we are bound in this case as set forth so strongly by the Louisiana Supreme Court in Rosell v. ESCO, 549 So.2d 840, 844-5 (La.1989) as follows:
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong,' and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. In applying the manifestly erroneousclearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.

When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
[Citations omitted].
In Martin v. East Jefferson General Hosp., 582 So.2d 1272 (La.1991), a case dealing specifically with medical malpractice, the court said:

*377 In a medical malpractice action against a physician, the plaintiff carries a twofold burden of proof. The plaintiff must first establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained. LSA-R.S. 9:2794; Smith v. State through DHHR, 523 So.2d 815, 819 (La. 1988); Hastings v. Baton Rouge General Hospital, 498 So.2d 713, 723 (La.1986). Resolution of each of these inquires are determinations of fact which should not be reversed on appeal absent manifest error. Housley v. Cerise, 579 So.2d 973 (La.1991); Smith, 523 So.2d at 822; Rosell v. ESCO, 549 So.2d 840 (La.1989); Hastings, 498 So.2d at 720.
At p. 1276.
Furthermore,
Louisiana jurisprudence has held that expert witnesses who are members of the medical profession are necessary sources of proof in medical malpractice actions to determine whether the defendant doctor possessed the requisite degree of skill and knowledge, or failed to exercise reasonable care and diligence. Frasier v. Department of HHR, 500 So.2d 858, 861 (La.App. 1st Cir.1986). The determination of an expert's credibility is also a factual question subject to the manifestly erroneous/clearly wrong standard of review. See, e.g., Anthony v. Hospital Service District No. 1, 477 So.2d 1180, 1184 (La.App. 1st Cir.1985); Rosell, 549 So.2d at 844.
At p. 1277.
The court also noted that:
We have previously explained that to establish causation in a situation where the patient dies, the plaintiff need only prove that the defendant's malpractice resulted in the patient's loss of a chance of survival, and that the plaintiff need not shoulder the `unreasonable burden' of proving that the patient would have survived if properly treated. Smith, 523 So.2d at 820 (citing Hastings, 498 So.2d at 721). We have also consistently held that causation is a factual finding which should not be reversed on appeal absent manifest error. Housley v. Cerise, supra; Smith, 523 So.2d at 822; Hastings, 498 So.2d at 720; see also Rosell v. ESCO, 549 So.2d 840 (La.1989).
At p. 1278.
We now turn to our analysis of the defendant's assignments of error.

MALPRACTICE
Defendant first argues that the trial court erred in finding that "Dr. Lang breached the standard of care required of radiologists in 1986" by subjecting Mrs. Riser to a procedure which would be of no benefit to her.
It is clear from the record that there is no breach of the standard of care in the manner in which Dr. Lang performed the arteriogram. The expert testimony established is without contradiction, that the femoral approach was the easiest and safest procedure in this case and that utilizing the brachial approach could have resulted in further impairment of the circulatory systems in upper extremities.
However, the defendant himself, as well as the expert witnesses in this case, testified that it is a breach of the standard of care for any physician to subject a patient to a particular test or procedure which has any risk of injury, however small, associated with it if that doctor knows or reasonably should know that the procedure will be of no benefit to the patient.
Dr. Sottiurai testified at trial that he requested the arteriogram of the upper extremities to try to discover the cause of Mrs. Riser's impaired circulation and developing gangrene to evaluate the possibility of vascular by-pass surgery. He requested bilateral brachial arteriography because he was familiar with that procedure and he believed he could get the information he needed. The conventional films did not show the linear structure of the blood vessels with any degree of clarity and the DSA films were of no use because the *378 images of the vessels were very small and he could not determine the actual size of the blood vessel and whether it was large enough to be amenable to by-pass surgery. Dr. Sottiurai further testified that, after reviewing the films obtained from the femoral arteriogram, he was unable to make a decision as to whether he could perform by-pass surgery based on those films.
Dr. Lang conceded that the films were suboptimal (substandard); however, he opined that he could have calibrated the DSA films. When questioned on the methods and results of calibration, his testimony was unclear and contradictory. Dr. Lang also admitted that he knew that Mrs. Riser's shunts could cause difficulty in obtaining pictures of the arteries in the lower extremities. Finally, Dr. Lang stated that he utilized this new proceduredigital subtraction angiography (DSA)because less dye was needed. Dr. Brown, an expert in radiology testified that this new technology had not "panned out" because the images are very small and resolution of these images was sometimes poor.
We recognize from the record that Dr. Lang is a highly qualified physician of eminent reputation in his field. Nevertheless, given the above testimony, we cannot say that the trial court was manifestly erroneous in concluding that Dr. Lang breached the acceptable standard of care in this particular instance by subjecting the patient to a procedure which he should reasonably have known would have been of no practicable benefit to the patient or to her referring physician.

CONSENT
The defendant argues that the trial court erred in finding a lack of "informed consent" prior to the performance of the femoral arteriogram. The doctrine of "informed consent" contemplates that a patient's consent to a particular procedure may be vitiated by the doctor's failure to disclose the material risks inherent in the procedure prior to obtaining the patient's consent to the performance of the procedure.
In Hondroulis v. Schuhmacher, 553 So.2d 398, 411-412 (La.1988), the court said:
The doctor's duty is to disclose all risks which are `material'. In broad outline, a risk is material when a reasonable person in what the doctor knows or should know to be the patient's position, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed therapy.
The factors contributing significance to a medical risk are the incidence of injury and the degree of the harm threatened. If the harm threatened is great, the risk may be significant even though the statistical possibility of its taking effect is very small. But if the chance of harm is slight enough, and the potential benefits of the therapy or the detriments of the existing malady great enough, the risk involved may not be significant even though the harm threatened is very great.
The determination of materiality is a two-step process. The first step is to define the existence and nature of the risk and the likelihood of its occurrence. `Some' expert testimony is necessary to establish this aspect of materiality because only a physician or other qualified expert is capable of judging what risk exist and the likelihood of occurrence. The second prong of the materiality test is for the trier of fact to decide whether the probability of that type harm is a risk which a reasonable patient would consider in deciding on treatment. The focus is on whether a reasonable person in the patient's position probably would attach significance to the specific risk. This determination of materiality does not require expert testimony.
[Citations omitted].
Plaintiffs contend that Mrs. Riser was not informed of the possibility of a stroke and, had she known of this possibility, she would not have consented to the procedure.
As noted by the Louisiana Supreme Court, the test is whether a reasonable person in the patient's position would have consented to the procedure.
*379 The evidence in this case clearly shows that, because of the many defective conditions existing in Mrs. Riser's state of health (as pointed out hereinabove), she was in a high risk category for a stroke even prior to the procedure; and that she was afraid of suffering complications from this procedure. In fact, the testimony also established that Mrs. Riser believed that she would undergo a brachial arteriogram, not a femoral arteriogram, and that she actually did not consent to the femoral procedure. See discussion, infra. Accordingly, we can see no error in the trial court's finding that a reasonable person in this position would have refused consent had she known of the strong possibility of a stroke.
The defendant also alleges that the trial court erred in finding that Mrs. Riser did not authorize a femoral arteriogram and that the procedure was without her consent. Before a doctor may subject a patient to any type of medical procedure, he must first obtain the patient's consent to the procedure that is to be performed. LSA-R.S. 40:1299.40. A doctor commits a battery on his patient when he undertakes a particular surgical procedure without consent unless there is an emergency situation. Roberson v. Provident House, 576 So.2d 992 (La.1991); Karl J. Pizzalotto, M.D., L.T.D. v. Wilson, 437 So.2d 859 (La. 1983).
The plaintiffs in this case allege that their mother never consented to undergo a femoral arteriogram. At trial, Dr. Sottiurai testified that he told Mrs. Riser that the arteriogram would be performed utilizing the brachial (elbow) approach. Furthermore, he asked Dr. Lang to perform a brachial arteriogram and that according to his notes, Dr. Sottiurai was under the impression that Dr. Lang was going to utilize the brachial approach.
Dr. Lang obtained two consent forms immediately prior to the execution of the arteriogram. Both forms were signed by Mrs. Riser and her daughter, Claudette O'Neil. The first authorizes "Dialysis Graft Arteriogram Brachial Arteriogram" and further states that:
In general terms, the nature and purpose of this operation or medical procedure is: place a catheter (small tube) into the Brachial/Femoral artery, select the arteries of interest (Arm and Graft) inject x-ray dye (contrast media) into those vessels and take x-ray pictures.
The second consent form authorizes a "Dialysis Graft Arteriogram (inject x-ray dye into vessels of interest and take x-ray pictures. Thus, neither consent form contains an express authorization to perform a femoral approach arteriogram.
Each of the three plaintiffs testified that their mother told them that the procedure was going to involve injecting dye into her elbows. Furthermore, each testified that the decedent was very much afraid of the femoral approach (having known someone who suffered a stroke after undergoing a femoral arteriogram) and the decedent emphatically and repeatedly told each that she would never undergo such a procedure.
Mrs. Riser's two daughters testified that Dr. Lang sought to obtain Mrs. O'Neil's (daughter) consent because her mother was too drugged to sign the form. Mrs. O'Neil was reluctant to agree to the femoral approach because of her mother's strong feelings, so she requested that Dr. Lang call her sister, Patricia Jones, who was an LPN; Dr. Lang agreed. Both Mrs. O'Neil and Mrs. Jones expressed great reluctance and they relayed to Dr. Lang the decedent's feelings, but were told that the procedure was necessary to save their mother's life. Mrs. O'Neil testified that "He [Dr. Lang] kept saying it would be in her best interest and if I loved her I'd sign it" [the consent form]. Mrs. Jones testified that when she spoke with Dr. Lang on the telephone and told him her mother would never agree to a femoral arteriogram he said "that it was really in her [Mrs. Riser] best interest to do so, if I loved her and wanted to do the best thing for her, that I would encourage my sister to sign the consent form."
Both also testified that they decided that Mrs. O'Neil should sign the form because they felt they had no other choice.
*380 Mrs. O'Neil also testified that when Dr. Lang presented her with the consent form, her mother's signature was not on the form. In addition, Mrs. O'Neil testified that when the procedure was completed, her mother complained of headaches and a burning sensation and asked "Why did you let them do that to me?"
Dr. Lang testified that he explained the femoral procedure to Mrs. Riser, she signed the consent form and then asked him to explain the procedure to her daughter. He did so and then had Mrs. O'Neil also sign the consent form.
Faced with this conflicting testimony, the trial court chose to believe plaintiffs. This is the trial judge's role and we can see no manifest error in this determination.
Defendant argues strenuously that plaintiffs failed to specifically plead battery, as opposed to pleading lack of "consent" and therefore this Court is precluded from addressing this issue on appeal. However, because of the facts in this case, these two issues are so interwoven with each other, we find that the issue of "informed consent" necessitates a consideration of actual "consent" and the two cannot, under the circumstances of this case, be separately determined. Thus we find that the failure to specifically enunciate lack of "consent" as opposed to lack of "informed consent" in the pleadings does not preclude our review of this issue.

CAUSATION
1. Defendant contends that the trial court erred in finding that the arteriogram was the probable cause of the brain stem infarct. In connection with this allegation, defendant also argues that the trial court erred in overruling their motion for directed verdict and allowing the plaintiffs to reopen the case to present the testimony of Dr. Bucklin.
During the second day of trial, October 4, 1990, plaintiffs rested their case after requesting that they be allowed to obtain and offer into evidence the testimony of Ben Nail, the radiology technician who had assisted Dr. Lang. Defendant moved for an involuntary dismissal, alleging among other things, that plaintiffs had not established a causal connection between the arteriogram and the stroke. The motion was denied and defendant proceeded with his case.
At the end of the day, trial was recessed until November 21, 1990, at which time Dr. Lang testified and defense then rested. Over the defendant's objection, plaintiffs were allowed to re-open their case and introduce the testimony of Dr. Bucklin, a pathologist, who testified as to causation. The matter was left open to allow defendant to produce additional evidence. As a result, defendant offered the deposition of Dr. Robert Welsh into evidence. As indicated by the trial judge's reasons, he found Dr. Bucklin's evidence to be the more crediblein fact, he adopted his findings as to the probable cause of the brain stem infarct or stroke (and subsequent death) being the femoral angiogram procedure.
2. In regard to appellant's contention that the trial judge erred in not granting their motion for involuntary dismissal of plaintiff's case, we note that:
LSA-C.C.P. art. 1672B provides:
In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.
Pursuant to the above language, the trial judge may elect to grant the motion or he may decline to render judgment until after all the evidence has been presented. Because this option is given to the trial judge, when he declines to grant an involuntary dismissal, as here, there is nothing for the appellate court to review. Blount v. Peabody Shoreline Geophysical, 439 So.2d 565 (La.App. 1 Cir.1983).
*381 Defendant next argues that the trial judge erred in allowing plaintiffs to reopen their case to allow the testimony of Dr. Bucklin. In this connection we take cognizance of LSA-C.C.P. art. 1631(A) which provides:
The court has the power to require that the proceedings shall be conducted with dignity and in an orderly and expeditious manner, and to control the proceedings at the trial, so that justice is done.
and of LSA-C.C.P. art. 1632 which provides:
The normal order of trial shall be as follows:
(1) The opening statements by the plaintiff and the defendant, in that order;
(2) The presentation of the evidence of the plaintiff and of the defendant, in that order;
(3) The presentation of the evidence of the plaintiff in rebuttal; and
(4) The argument of the plaintiff, of the defendant, and of the plaintiff in rebuttal, in that order.
This order may be varied by the court when circumstances so justify.
When an action involves parties in addition to the plaintiff and the defendant, the court shall determine the order of trial as to them and the plaintiff and the defendant.
Also, as we noted in Hall v. Hall, 588 So.2d 172 (La.App. 5 Cir.1991), the trial court is given great discretion in controlling proceedings at trial:
Our jurisprudence explains that La. C.C.P. art. 1632 gives the trial judge the authority to deviate from the normal order of proceedings, when justice so requires. This authority includes the power of the judge to keep open or reopen the proceedings for the reception of additional testimony or documentary evidence. The reopening of a case is within the discretion of the trial court and will not be interfered with by the reviewing court absent manifest error. Bricks Unlimited, Inc. v. Stepter, 538 So.2d 1147 (La.App. 4th Cir.1989); Broussard v. Coleman, 479 So.2d 1016 (La.App. 3d Cir.1985), writ denied, 481 So.2d 1354 (La.1986).
In this case, plaintiffs allege that prior to trial they were led to believe that the testimony of Dr. Hunt, the pathologist who performed the autopsy, would be favorable to plaintiffs' case. When Dr. Hunt testified at trial his testimony varied from the statements he had previously given to plaintiffs' attorney. Accordingly, the trial court allowed plaintiff to reopen their case to allow Dr. Bucklin's testimony; and the court stated that it also would give Dr. Lang the opportunity to adduce additional evidence or witnesses in rebuttalwhich he did by offering the deposition of Dr. Ronald Welsh in evidence. Under these circumstances, we can see no injustice or prejudice to defendant and no manifest error in the trial court's actions in this regard.
Defendant next argues that the plaintiffs failed to meet their burden of proving causation by a preponderance of the evidence. Three pathologists testified on the issue of the cause of plaintiff's death.
Dr. Hunt testified that the decedent died as a result of a brain stem infarct caused by a thrombus (not an embolus)[2] which had developed in the basilar artery which is at the base of the decedent's brain. He further opined that the clot probably was 24-48 hours old, but admitted that it could be 5-6 days old.
Dr. Bucklin, whom the trial judge chose to believe, also testified that decedent died from a brain stem infarct, however, he opined that the clot could not have formed in the basilar artery. Instead, in his opinion, the clot was formed in another vessel and subsequently traveled to the basilar *382 artery. Dr. Bucklin further testified that the age of the clot could range from days to weeks. He also stated that the closeness in time between the arteriogram and the brain stem infarct indicated that it was more probable than not that the catheter used in the arteriogram dislodged some material which formed an embolus that traveled to the base of the brain.
Dr. Ronald Hunt testified that there was no evidence of brain stem infarct and that the clot probably occurred one to two hours before death or post-mortem.
Faced with this conflicting testimony, the trial court chose to credit, and even adopt, the testimony of Dr. Bucklin over that of Dr. Hunt. As previously noted, we cannot say that he was manifestly erroneous in this decision as it represented a clear choice between the conflicting opinions of two apparently equally qualified experts.

DAMAGES
In his last assignment of error, defendant alleges that the damages awarded by the trial court are excessive.
In the assessment of damages in cases of offenses and quasi offenses, much discretion is left to the judge or jury and before an appellate court can disturb an award made by the trial court, the record must clearly reveal that the trier of fact abused its discretion in making such an award. American Motorist v. American Rent-All, 579 So.2d 429, 433-4 (La. 1991). An abuse of discretion is present only when the award is so excessively high or low as to shock a reviewing court into the realization that it must correct the award. Brooks v. City of Baton Rouge, 558 So.2d 1177 (La.App. 1 Cir.1990).
In this case, the three major children each testified that he/she had a close, loving relationship with the decedent. We find that under these circumstances an award of $100,000.00 to each major child, while on the high side, is not excessive and is not an abuse of the trial judge's "much discretion". Compare Bourgeois v. Puerto Rican Marine Manage., 589 So.2d 1226 (La.App. 4 Cir.1991) and Brooks v. City of Baton Rouge, supra.
Defendant also alleges that the award of $50,000.00 for Mrs. Riser's pain and suffering prior to her death is excessive.
The record reflects that the decedent was conscious for at least one and one-half hours prior to becoming comatose at which time she complained of severe pain to her daughter. After that time, the decedent remained alive for eleven more days before she ultimately died. Mrs. Riser's son testified that, when he saw her two days after the stroke, she was staring at the ceiling, her lips and tongue were ulcerated, her body jerked uncontrollably and she made mumbling sounds. When he said, "Mom," she tried to communicate and became agitated at her inability. Based on the evidence before us, although the award again is on the high side, we cannot say that the award of $50,000.00 for pain and suffering is clearly wrong as being excessive, nor that the trial judge abused his much discretion.

CONCLUSION
For the above discussed reasons, the judgment of the trial court is affirmed. All costs of this appeal are assessed against defendant.
AFFIRMED.
NOTES
[1] Reasons for judgment signed on December 19, 1991 and amended reasons for judgment signed on December 30, 1991.
[2] Dr. Hunt testified that a thrombus is a blood clot which forms in a blood vessel, usually over an area of damage to the blood vessel wall, and then becomes affixed to the vessel wall and stays in that location. An embolus is a blood clot which forms in a blood vessel which may or may not be diseased and which is carried from the place where it initially formed to some other part of the body.