NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

24-536

DESTINY JENAE VENABLE

VERSUS

NICHOLAS SCHMIT

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20243555
HONORABLE MICHELE S. BILLEAUD, DISTRICT JUDGE

**********

CANDYCE G. PERRET
JUDGE

**********

Court composed of Candyce G. Perret, Jonathan W. Perry, Guy E. Bradberry, Judges.

AFFIRMED.

**Dwazendra J. Smith**
**D. Smith Legal, L.L.C.**
**1030 Lafayette Street**
**Lafayette, LA  70501**
**(337) 534-4020**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Nicholas Schmit**

**Taylor Fontenot**
**Attorney at Law**
**321 W. Main Street Suite 2G**
**Lafayette, LA 70501**
**(337) 704-7255**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Nicholas Schmit**

**Destiny Jenae Venable**
**400 Rue Plaisance**
**Youngsville, LA  70592**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
     **In Proper Person**

**PERRET, Judge.**

Nicholas Schmit appeals the trial court's grant of a protective order in favor of the plaintiff, Destiny Jenae Venable. For the reasons that follow, we hereby affirm the trial court judgment.

**FACTS AND PROCEDURAL HISTORY:**

Ms. Venable and Mr. Schmit are members of the Louisiana National Guard. On June 7, 2024, Ms. Venable filed a "Petition for Protection from Stalking or Sexual Assault" against Mr. Schmit. In the petition, Ms. Venable provided the following specific details of her most recent alleged incidents of stalking by Mr. Schmit, which occurred on June 6 and 7, 2024:

> Defendant drove past Petitioner[']s house while taking photos and videos of the cars on the property. A photo was taken around 9-10 pm June 6th 2024 of the cars at the house. On the morning of June 7th[,] the Defendant drove by again while taking a video of the home and all cars on the property.

Ms. Venable also provided the following details of past incidents of stalking by Mr. Schmit:

> Defendant has called the Petitioner on multiple occasions belittling her and verbally harassing her. Topics of discussion include but are not limited to: made claims of dating Petitioner when there was no established relationship, while Petitioner was pregnant[,] told her she needed to have an abortion, after Petitioner had a miscarriage[,] told her she deserved it. Told Petitioner he could fix her and she was broken and demanded she be loyal to him.

The trial court issued a temporary restraining order based on a finding that the allegations of the petition constituted "an immediate and present danger of stalking" and set the matter for a hearing on July 1, 2024.

After the conclusion of the July 1, 2024 hearing, the trial court issued a "Uniform Abuse Prevention Order," effective through December 1, 2025, ordering Mr. Schmit to not "abuse, harass, assault, stalk, follow, track, monitor, or threaten"

Ms. Venable. It also ordered Mr. Schmit: (1) to not contact Ms. Venable, her family members, or her acquaintances; (2) to not go "within 100 yards" of Ms. Venable or her residence; (3) to pay all court costs; and (4) to "seek professional counseling and/or complete a court-monitored domestic abuse intervention program." The trial judge provided the following written reasons for her ruling, in pertinent part:

> Stalking is the intentional and repeated following or harassing of another person that would cause a reasonable person to feel alarmed or to suffer emotional distress. Based on Ms. Venable's testimony and her supporting affidavit, clearly this was a relationship that these two people had, whether it was a friendship that may be leading to a more intimate relationship or not; that they had a friendship of some sort. I find Ms. Venable's testimony to be very credible; she very clearly said that she's not afraid of him, she doesn't think he's actually going to hurt her or her property, but that she wants it to stop. She wants him to stop communicating with her and stop coming by her house. What is most notable to the court is that all of the things that were acceptable to Mr. Schmit, when the parties had a relationship, even if not allowed by the military, are now, suddenly not acceptable. Once the friendship ended, Mr. Schmit now states that the regulations have to be enforced. On June 6, 2024, Mr. Schmit had Ms. Venable detained at work so he could drive by her house and take a picture. He drove by her house on the 7th when she was present and took a second picture. Mr. Schmit's explanation of why he needed to drive by her house was not credible. He stated he needed to go check on his soldiers but taking the entirety of his testimony this court finds that this behavior combined with repeated texting and phone calls had much more to do with harassing Ms. Venable than checking on his soldiers.

> The repeated texting and phone calls, specifically those advising her to have an abortion or that it was karma that she had a miscarriage for the way she treated him is questionable and alarming to the court and done for no other reason than to harass Ms. Venable. The testimony supports a finding that the actions of Mr. Schmit would cause a reasonable person to suffer emotional distress. Accordingly, this court grants the protective order.

Mr. Schmit now appeals, arguing that the trial court erred in (1) failing to rule on his two motions for an involuntary dismissal, and (2) granting an eighteen-month protective order.

**STANDARD OF REVIEW:**

"A trial court has wide discretion in granting a protective order, which an appellate court reviews under the abuse of discretion standard." *Selcer v. Boudreaux*, 20-623, p.2 (La.App. 3 Cir. 5/26/21), 318 So.3d 393, 395. "Additionally, the trial court sitting as a trier of fact is in the best position to evaluate the demeanor of the witnesses, and its credibility determinations will not be disturbed on appeal absent manifest error." *Head v. Robichaux*, 18-366, p. 4 (La.App. 1 Cir. 11/2/18), 265 So.3d 813, 817.

**DISCUSSION:**

The first issue to address is whether the trial court erred in failing to rule on Mr. Schmit's two motions for an involuntary dismissal. The trial court's judgment did not address Mr. Schmit's motions for involuntary dismissal, but simply granted Ms. Venable's petition for protection from stalking against Mr. Schmit. However, "[t]he failure to address an issue in a judgment is deemed to be a denial of that issue." *Leday v. Safeway Ins. Co. of La.*, 04-610, p. 3 (La.App. 3 Cir. 11/17/04), 888 So.2d 1084, 1087. Thus, the trial court's refusal to address Mr. Schmit's motions are deemed to be a denial of those motions.

"The trial court has much discretion in determining whether to grant a motion for involuntary dismissal." *Lopez v. State, La. Health Care Auth./Univ. Med. Ctr.*, 98-577, p. 4 (La.App. 3 Cir. 10/28/98), 721 So.2d 518, 520. The procedure for an involuntary dismissal is governed by La.Code Civ.P. art. 1672(B), which provides as follows (emphasis added):

> In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The

3

court may then determine the facts and render judgment against the plaintiff and in favor of the moving party *or may decline to render any judgment until the close of all the evidence.*

As this court stated in *Hudson v. AIG National Ins. Co.,* 10-63, p. 4 (La.App. 3 Cir. 6/2/10), 40 So.3d 484, 488, regarding La.Code Civ.P. art. 1672(B):

> Our review of the explicit language of applicable article is that the trial court "may decline to render any judgment until the close of all the evidence." La.Code Civ.P. art. 1672(B). Thus, there is nothing for this court to review, as the denial of a motion for involuntary dismissal is purely discretionary. *See Townsend v. Delchamps, Inc.,* 94-1511 (La.App. 1 Cir. 10/6/95), 671 So.2d 513, *writ denied,* 95-2648 (La.1/12/96), 667 So.2d 522; *Parker v. Winn-Dixie La., Inc.,* 615 So.2d 378 (La.App. 5 Cir.1993); *Riser v. Am. Med. Int'l, Inc.,* 620 So.2d 372 (La.App. 5 Cir.1993); *Blount v. Peabody Shoreline Geophysical,* 439 So.2d 565 (La.App. 1 Cir.1983). Accordingly, we find no merit to this assignment of error.

Similarly, in this case, the denial of the motions for involuntary dismissal were purely discretionary with the trial judge; thus, we find no merit in Mr. Schmit's assignment of error that the trial court legally erred in failing to rule on the motions.

The second issue to address is whether the trial court erred in granting the petition for protection from stalking in favor of Ms. Venable and in ordering the eighteen-month protective order. "The Protection from Stalking Act, found in La.R.S. 46:2171–46:2174, was enacted to provide a civil remedy for stalking victims against perpetrators, offering immediate and easily accessible protection." *Selcer v. Boudreaux*, 20-623, p. 1 (La.App. 3 Cir. 5/26/21), 318 So.3d 393, 395. The purpose of the Protection from Stalking Act is set forth in La.R.S. 46:2171, and states as follows:

> The legislature hereby finds and declares that there is a present and growing need to develop innovative strategies and services which will reduce and treat the trauma of stranger and acquaintance stalking. The nature of stalking allegations are sometimes not easily substantiated to meet the prosecution's burden of proving the case beyond a reasonable doubt, and victims of stalking are left without protection. Orders of protection are a proven deterrent that can protect victims of stalking

from further victimization; however, many victims are forced to pursue civil orders of protection through ordinary process, often unrepresented, rather than through a shortened, summary proceeding. Additionally, victims of stalking are not always aware of the vast resources available to assist them in recovering from the trauma associated with being a victim of stalking. It is the intent of the legislature to provide a civil remedy for victims of stalking that will afford the victim immediate and easily accessible protection.

Louisiana Revised Statutes 46:2172 provides, in pertinent part, that "'stalking' means any act that would constitute the crime of stalking under R.S. 14:40.2 or cyberstalking under R.S. 14:40.3." Louisiana Revised Statutes 14:40.2 defines stalking as follows, in pertinent part:

> A. Stalking is the intentional and repeated following or harassing of another person that would cause a reasonable person to feel alarmed or to suffer emotional distress. Stalking shall include but not be limited to the intentional and repeated uninvited presence of the perpetrator at another person's home, workplace, school, or any place which would cause a reasonable person to be alarmed, or to suffer emotional distress as a result of verbal, written, or behaviorally implied threats of death, bodily injury, sexual assault, kidnapping, or any other statutory criminal act to himself or any member of his family or any person with whom he is acquainted.
>
> . . . .
>
> C. For the purposes of this Section, the following words shall have the following meanings:
>
> (1) "Harassing" means the repeated pattern of verbal communications or nonverbal behavior without invitation which includes but is not limited to making telephone calls, transmitting electronic mail, sending messages via a third party, or sending letters or pictures.
>
> (2) "Pattern of conduct" means a series of acts over a period of time, however short, evidencing an intent to inflict a continuity of emotional distress upon the person. Constitutionally protected activity is not included within the meaning of pattern of conduct.

Additionally, the crime of cyberstalking is set forth in La.R.S. 14:40.3 and defines it as an "action of any person to accomplish any of the following: . . . (2) Electronically mail or electronically communicate to another repeatedly, whether or

5

not conversation ensues, for the purpose of threatening, terrifying, or harassing any person." La.R.S. 14:40.3(B)(2).

At the July 1, 2024 hearing, both Ms. Venable and Mr. Schmit testified. Specifically, Ms. Venable responded to the trial judge's questions as follows, in pertinent part:

THE COURT:

> All right. So he would call you multiple times, is that your allegation?

MS. VENABLE:

> There's been a couple -- couple of phone calls.

THE COURT:

> Two?

MS. VENABLE:

> No, no, multiple over a span of a few months, and also a couple of lengthy –
>
> . . . .
>
> More in the tens, 20s.

THE COURT:

> Okay.

MS. VENABLE:

> There's, like I said, Your Honor, over a couple of months. It's hard to --

THE COURT:

> And what were these phone calls in relation to?

MS. VENABLE:

> It would start out with "What do you want from me" and I would go into I want a working relationship. And then it would divulge into

"We can't do that, I don't want that, what do you want from me?" And I would reiterate I want a working relationship, that is -- that is it.

THE COURT:

Okay. And so, did you feel threatened by what he was doing?

MS. VENABLE:

The phone calls I was able to tolerate. I understand emotions can run high and I would just brush it off. I knew where I stood and I knew I was comfortable with not having a relationship. Where I became uncomfortable was the driving past the house, and that's when I was advised by my leadership to push for a restraining order.

. . . .

THE COURT:

And do you feel threatened and harassed by his behavior?

MS. VENABLE:

I do not fear for my personal safety. I am not worried about Mr. Schmit harming me or my property in any way. I would just really like to continue the no communication and the professional only when we have to speak to each other.

On direct examination, Ms. Venable responded to questions from Taylor Fontenot, Mr. Schmit's counsel, as follows, in pertinent part:

Q.    Okay. Mr. Schmit never threatened you in any way, did he?

A.    I do not fear my life from Mr. Schmit, correct.

Q.    Okay. Isn't it true that Mr. Schmit drove by your house because one of his officers was at your house?

A.    I did not know the reasoning of him driving past my house. I do not find it appropriate for him to drive past my house regardless of who's there.

Q.    Isn't it true that Specialist Mitchell was at your house on June 6th and 7th?

A.    Specialist Mitchell and Sergeant Chandler both came to my house to wash their clothes after returning home from Camp Shelby, Mississippi, correct.

7

Q. You were not at the house on the evening of June 6th when he rode by, correct?

A. Not at the moment, I was still at work.

Q. Okay. You were there the morning of June 7th?

A. I was, correct.

Q. And Specialist Mitchell was still there?

A. So was Sergeant Chandler.

On direct examination, Mr. Schmit responded to the following pertinent questions from Mr. Fontenot and the trial judge:

BY MR. FONTENOT:

Q Did you go by Destiny's house on June 6th and 7th?

A Yes, that's correct.

Q And why is that?

A At the time we were on active duty, Your Honor. I had several issues with multiple soldiers while we were at Camp Shelby in Mississippi that stem from Sergeant Venable's, I don't know if you want to say demeanor or actions that she was taking out there. Just a lot of problems with leadership where we had issues accounting for soldiers after hours or whenever we'd get off active -- not get off active duty, but on our off time if you will she would be around my soldiers and she would trash talk, which would undermine leadership. So we had a lot of issues needless to say. My soldiers were ordered by my NCO to cease communication with her, and likewise her officer ordered her to cease communication with my soldiers. We had a hunch that --

. . . .

So the point on the 6th and the 7th was that my soldier, after talking to Lieutenant Miguez we had a feeling that he was lying, that he wasn't going to the location that he said he was going, and so whatever the case is we released him an hour early. I stayed an hour later and then Lieutenant Miguez said that he would keep her an hour later after that. I said on chance I'm just going to drive by the house and see if his car is there. I drove by the house, the car happened to be there. I took a picture, drove off, texted her officer, Lieutenant Miguez, saying hey, they're both lying. I'm going to give her a chance in a phone call to tell

8

the truth and then send the soldier back to the armory for accountability with you. I called her, she lied, and then I called Lieutenant Miguez back and said hey, she lied, we'll have to do paperwork in the morning.

When the trial judge asked whether there was any reason for Ms. Venable to have him involved in any of her assignments, Mr. Schmit responded, as follows:

> We have to work -- and this is something that stemmed for an issue during HA. If I may address all the phone calls and stuff like this. This was not one instance as it's portrayed where I'm calling and texting her and receiving nothing back. I believe at some point we can introduce evidence that shows vice versa, she called and texted just nearly as much asking to talk over the course of nine months and especially over the past month. It's not one sided. As towards the other allegations that she brought forth such as oh, well I don't want our -- I just want a professional relationship and all that. I said yeah, in most cases that's fine, but she'd say well, I want a professional relationship with the friendship that happened before everything. I said that's not fine. Army regulations says we can not do this. I stated many times, as you can see once the evidence is introduced, that hey, this is not okay. I tolerated it because we had these extenuating circumstances and now they no longer exist, we have to go back to the standard. Sergeant Venable did not want to follow the standard. This is the same case for the soldiers and the accountability issues that we had, and so paperwork was put in process with the military to start action.

The trial judge also asked Mr. Schmit whether he agreed with the fact that Ms. Venable only wanted a professional relationship. Mr. Schmit responded as follows:

> Likewise[,] I sent texts that said the exact same thing. The issue that we had with the professional relation -- or professional relationship is she expected to continue the friendship aspects, the fraternization, and the trash talking with my soldiers, which is not allowed. And lying to a commissioned officer while on active duty is punishable as well.

The trial judge also requested for Mr. Schmit and Ms. Venable to "enter into a consent agreement that basically says you-all are going to stay away from each other, other than when you have to be together due to work -- during work related incidents." Mr. Schmit responded to this request as follows:

> No, Your Honor. There's several reasons, because both clearance wise and Army wise that is not permissible in my case. What I am essentially here and looking for is that this was brought frivolously. I understand a lot of cases -- that you might perceive

retaliation, but what I'm saying is what happened and occurred between us was wrong. And it's not retaliation, it's saying I cannot make a special exception anymore for these friendships and stuff to continue in my section.

> . . . .

> If you grant it then it has repercussions on me [sic] clearance wise that obviously we can't work together anymore, which is going to cause even more issues. Likewise[,] a frivolous ruling allows us to bring this back to the military side and it be handled through our new regulation as it should have been in the first place.

Upon review, based on the totality of the record, we find no abuse of the trial court's discretion in finding that Mr. Schmit's text messaging, phone calls, and drives around Ms. Venable's residence, while taking pictures and videos of the vehicles that were in her driveway, constituted a "repeated pattern of verbal communications or nonverbal behavior without invitation" that would cause a reasonable person to feel alarmed or to suffer emotional distress under the circumstances. The trial judge weighed the evidence and the credibility of the witnesses in finding that Ms. Venable proved her allegations of stalking by a preponderance of the evidence. Where, as in this case, two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. *See Stobart v. State, Department of Transportation and Development*, 617 So.2d 880, 882 (La.1993). Therefore, the trial court's judgment granting the protective order in favor of Ms. Venable and against Mr. Schmit is affirmed. All costs of this appeal are assessed to the appellant, Mr. Schmit.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.

10