661 So.2d 991 (1995)
Leonard GORDON, et al., Plaintiffs-Appellants,
v.
WILLIS KNIGHTON MEDICAL CENTER, Defendant-Appellee.
No. 27,044-CA.
Court of Appeal of Louisiana, Second Circuit.
June 21, 1995.
Order Denying Rehearing October 19, 1995.
*993 John L. Hammons, Shreveport, for appellant.
Peter T. Dazzio, Baton Rouge, for appellee.
Before BROWN, WILLIAMS, JJ., and EDWARDS, J. Pro Tem.
EDWARDS, Judge Pro Tem.
Leonard Gordon, Josie Johnston and Mary Ann Gentile, major children of Elizabeth Gordon, appeal a district court judgment that dismissed their wrongful death and survival claims against Willis Knighton Medical Center in this medical malpractice action. Following trial, the jury returned a verdict in favor of Willis Knighton, dismissing plaintiffs' claims. The trial court dismissed the suit and subsequently denied plaintiffs' motions for judgment notwithstanding the verdict and new trial. We conclude the jury was manifestly wrong in finding the hospital did not breach the standard of care. Accordingly we reverse and render.

FACTS
On February 14, 1988, Elizabeth Gordon, 76, suffered chest pain and shortness of breath while playing Bingo at the Knights of Columbus Hall on Greenwood Road. The Shreveport Fire Department dispatched paramedics who arrived at 7:42 p.m., recorded Ms. Gordon's vital signs, placed her on a portable heart monitor, started her on oxygen and transported her to Willis Knighton Medical Center. According to the ambulance records, Ms. Gordon arrived at Willis Knighton at 7:49 p.m. The hospital's emergency room records indicate Ms. Gordon arrived at 7:50 p.m. However, this entry had been altered in such a manner that no one can determine the original entry. It is undisputed that the emergency room nurses who received Ms. Gordon discontinued the oxygen started by the paramedics.
A friend of the Gordon family called Ms. Gordon's son, Leonard Gordon, and told him that his mother had been taken to Willis Knighton by ambulance. Leonard Gordon, his wife Terri and their two children immediately drove to Willis Knighton and inquired at the emergency room desk about Ms. Elizabeth Gordon. The attendant seated at the emergency room desk told Leonard and Terri *994 that Ms. Gordon was not a patient in the Willis Knighton emergency room. Leaving Terri and the children at the Willis Knighton emergency room, Leonard drove to the Knights of Columbus Hall where acquaintances assured him the ambulance had taken his mother to Willis Knighton.
When Leonard returned to Willis Knighton, the same emergency room attendant reiterated that Ms. Gordon was not in the emergency room. Terri Gordon testified that Ms. Gordon was not brought into the emergency room during Leonard's absence. Leonard began searching for his mother, going from room to room, and eventually found Ms. Gordon in one of the emergency rooms. Leonard Gordon testified that his mother was alone, fully clothed, and not attached to a heart monitor when he entered her room. Terri Gordon testified that she looked into the room and Ms. Gordon was alone, fully clothed, and did not appear to be attached to a heart monitor.
Terri Gordon returned to the emergency room desk to fill out Ms. Gordon's admission papers. Leonard returned to the desk, informed the attendant his mother was in an emergency room, and asked for assistance. When Leonard returned to his mother's room, she was still unattended and complaining of indigestion type chest pain. As Leonard attempted to help his mother off the stretcher and into the bathroom, she collapsed and fell back onto the bed. Leonard immediately ran into the hall screaming for help.
Patricia Ann Bogan, an emergency room nurse, responded to Leonard's cries for help with the question "Who is your momma?" Leonard responded that his mother was in an emergency room and had passed out. The nursing staff called a "code" and the hospital staff attempted to revive Ms. Gordon. A "code" is the process of trying to return a patient's circulatory, breathing, and neurological status to normal. The efforts of Dr. Fair, the emergency room physician, and Dr. Reed, a cardiologist, to resuscitate Ms. Gordon failed and she was pronounced dead at 9:15 p.m.

Medical Experts' Testimony
The court recognized Dr. Robert Hernandez, a board certified internal medicine doctor, as an expert in emergency medicine. At the time of trial, Dr. Hernandez was the director of emergency services at Schumpert Medical Center in Shreveport and an assistant professor of emergency services at LSU Medical School. Dr. Hernandez testified that Ms. Gordon should have been classified as an urgent cardiac patient upon arrival at Willis Knighton. Accordingly, she should have been evaluated immediately by a nurse and evaluated by a physician within 15-30 minutes. Dr. Hernandez also testified that Ms. Gordon should have been given oxygen and monitored in the emergency room. It is undisputed that the emergency room nurses removed the oxygen placed on Ms. Gordon by the paramedics and did not administer oxygen while she was in the emergency room.
Dr. Hernandez testified further that in 1988 a cardiac patient could be effectively monitored in one of three ways. First, the patient could be monitored by a central monitor located at the nurses' station. This system is called telemetry and allows medical personnel to monitor a patient's heart rate from a remote location as it prints out on a screen at the nurses station. Second, a cardiac patient could be monitored by attaching the patient to an individual heart monitor which is manufactured with an alarm that would sound if the patient's heart rate rose above or fell below a certain number of beats per minute, thereby alerting medical personnel that a cardiac event was imminent. Third, if the emergency room was not equipped with a central monitor, or if the individual monitors were not equipped with an alarm, then the only acceptable method to monitor a cardiac patient was to have trained medical personnel in the room constantly watching the monitor.
It is undisputed that Willis Knighton did not have a central monitor in February 1988. It is also undisputed that no one heard an alarm sound. Nurse Overstreet, whose testimony will be discussed in detail later, testified he attached Ms. Gordon to a monitor, but could not remember setting the alarm. *995 The only warning or indication anyone received was Leonard Gordon's cries for help after his mother lost consciousness.
Dr. Hernandez also testified that the myocardial infarct or heart attack was caused by a lack of oxygen to the heart, and if Willis Knighton had placed Ms. Gordon on oxygen, then her chances of suffering a heart attack would have been reduced. Finally, Dr. Hernandez testified the medical records pertaining to Ms. Gordon had been altered in an improper fashion. Instead of marking through the alleged incorrect time, writing the correct time above it, and initialling it, one of the nurses simply wrote over the original time recordings. On direct examination Dr. Hernandez was asked the following question:
Q. After going through everything today and after looking at these records which and the information that you've considered which includes the fact that no oxygen was given, which includes the fact that there is no recordation and no evidence presented by Willis Knighton to you at the medical review panel stage, that the alarm was set or that the alarm ever went off, assuming there was a monitor; and assuming further that blood gases were not drawn and not reportednot drawn until 9:07 and not reported until ten minutes after she died, even if you were to assume facts favorable to Willis Knighton, isn't it necessarily true that those items themselves establish a breach of the appropriate emergency room standards?
A. Yes.
On cross-examination Dr. Hernandez testified that Ms. Gordon had less than a 2% chance of survival "at the point she had a respiratory cardiac arrest according to the literature." It is important to note that Dr. Hernandez did not comment on her chance of survival if the respiratory cardiac arrest had been prevented.
Dr. Ellis Cooper, board certified in internal medicine, testified that it would be improper for Willis Knighton not to have placed Ms. Gordon on a heart monitor. Although Dr. Cooper stated some cardiac patients do not have unusual heart beats prior to death, Dr. Reed's notes indicated Ms. Gordon was suffering from this condition when the code was called. Dr. Cooper also stated that cardiac patients should be given oxygen in the emergency room and the medical records were improperly amended. On cross-examination, Dr. Cooper testified that Ms. Gordon had a massive heart attack "[a]nd I think her chances of survival in that situation were very very small." It is again important to note that Dr. Cooper distinguished between Ms. Gordon's chances of survival once the heart attack occurred and her chances of survival if the underlying cause of the heart attack had been detected and treated.
Dr. Harry Fair, a board certified general surgeon, was the emergency room doctor on the night Ms. Gordon died. He testified the nursing staff did not inform him of Ms. Gordon's arrival and he initially became aware of her presence when the code was called. Dr. Fair recalled Ms. Gordon was on a heart monitor when he reached her room. Dr. Fair testified that oxygen should have been continued and Ms. Gordon should have been monitored. Interestingly, it was Dr. Fair's opinion that Ms. Gordon's symptoms "obviously" were an "imminent symptom of a heart attack in progress."
Jackie Gay, a registered nurse working in the emergency room on the night Ms. Gordon died, testified she "went through the room (Ms. Gordon's) to look for a bed and I noticed Ms. Gordon in the room." Nurse Gay testified she saw a man in the room, observed the heart monitor which registered a normal sinus rhythm, and determined Ms. Gordon was in no acute distress. Nurse Gay admitted there were no other medical personnel in the room and admitted she was in the room for approximately 2-3 seconds and did not chart her observations. Approximately five minutes after Nurse Gay left the room, Ms. Gordon collapsed.
Nurse Gay assisted with the code and admitted the medical record contained mistakes such as a notation that insulin was given to Ms. Gordon 10 minutes after she was pronounced dead by a physician. The testimony indicates that during a code it is often not possible to record the events simultaneously on the official medical record. Nurses often *996 write on whatever object is available and then after the code is completed they will reconstruct the events of the code. Nurse Gay admitted the medical records of Ms. Gordon were improperly altered.
Dr. Marion Cash, a member of the medical review panel, testified that Willis Knighton should have assumed Ms. Gordon was a cardiac patient until ruling it out. Furthermore, if Willis Knighton did not monitor her condition it would have been a deviation from the standard of care. Dr. Cash reiterated the monitoring could be accomplished either by having a medical personnel continuously at the bed, or intermittently with the help of an alarm, or remotely with a central monitor. Dr. Cash indicated that if a patient is properly monitored, then there are signals which might indicate a cardiac event is imminent and if treatment is started immediately, then the cardiac event might be avoided. Dr. Cash estimated Ms. Gordon's chance of survival at 50% if all possible medical care had been available at the moment she collapsed.
Dr. Michael Reed, a board certified cardiologist and fellow in the American College of Cardiology, was seeing another patient on the night Ms. Gordon died. Dr. Reed agreed with the other doctors that Ms. Gordon was a cardiac patient when she came into the emergency room and the staff should have placed her on a heart monitor, reassessed her vital signs and started an intravenous line in case drug treatment became necessary. If a cardiac patient is not placed on a monitor, or the monitor is not properly observed, the risk incurred is that an arrhythmia or irregular heart beat will go undetected until the patient collapses or has a cardiac arrest. Dr. Reed testified that arrhythmias are reversible if detected in time and that is the purpose of putting cardiac patients on a monitor. If arrhythmias are detected they can be treated with drugs or shock therapy. Dr. Reed testified that a patient who arrives at the emergency room alive after suffering a heart attack has a 90% chance of survival with the proper medical treatment.
Dr. Reed was present in a nearby area of the emergency room 15-20 minutes prior to the code and was never advised that Ms. Gordon was present or that she was a cardiac patient. If so advised, Dr. Reed stated he would have treated her. Dr. Reed stated the medical records did not indicate Ms. Gordon was monitored at all after the paramedics left her at the hospital. Her vital signs were not updated, and there is no recorded indication that anyone observed the monitor she was allegedly placed on by Nurse Bogan. Dr. Reed testified if cardiac intervention had occurred prior to the code Ms. Gordon's chances of survival would have increased.
Dr. Reed responded to the code and was responsible for its direction. When Dr. Reed reached Ms. Gordon's room she was gasping for breath, but not able to breathe. Dr. Reed stated Ms. Gordon was still wearing her slacks, but he did not remember if her shirt was on because the nurse had already begun CPR. Contrary to the testimony of the emergency room nurses, Dr. Reed stated normal vital signs do not necessarily indicate a patient is not in acute distress. Ms. Gordon's ongoing symptoms of chest pain and shortness of breath indicated she was in acute distress. Dr. Reed also agreed the medical charts were improperly altered.

Nurses' Testimony
Patricia Ann Bogan, another registered nurse working in the emergency room the night Ms. Gordon died, testified she took private notes following the code but subsequently lost them. She admitted Willis Knighton did not have a central monitor in 1988 and that Ms. Gordon was not constantly monitored by medical personnel. Nurse Bogan also testified she was not certain the monitor on which Ms. Gordon was allegedly placed was equipped with an alarm. She disagreed with the doctors on whether the discontinuation of oxygen was a deviation from the accepted standard of care. Nurse Bogan asserted she undressed Ms. Gordon and placed her on a heart monitor which indicated Ms. Gordon was in normal sinus rhythm; however, these actions do not appear in the medical records. Ten minutes later, Nurse Bogan returned to the room at the insistence of Leonard Gordon to find Ms. Gordon gasping for breath.
Lloyd Overstreet, a registered nurse working in the emergency room the night Ms. *997 Gordon died, took responsibility for altering the records and attributed it to a ten-minute differential between his watch and the clock in the hospital room. Some times were recorded per his watch and some times were recorded per the hospital clock. Nurse Overstreet testified he helped place Ms. Gordon on a heart monitor, but there was no central monitor, no continuous monitoring by an individual and he did not remember an alarm on the monitor. He admitted that monitors without telemetry and without an alarm must be constantly watched by trained medical personnel.

Testimony by Ms. Gordon's Children
Leonard Gordon testified he received a phone call informing him that his mother had been taken to Willis Knighton. Leonard related how he was told twice by hospital personnel that Ms. Gordon was not present and how he discovered her alone in one of the emergency rooms. Leonard's request for assistance was apparently ignored prior to his mother's collapse. Finally, Leonard explained how his mother died in his arms as he tried to assist her, and what a profound effect this had on him.
Mrs. Mary Ann Gentile, major daughter of Elizabeth Gordon, was notified of her mother's death over the phone and collapsed when she heard the news. Mrs. Gentile stated she was very upset to think her mother was transported quickly to the hospital but then left unattended until she lost consciousness. The fact that her mother died in her brother's arms was also extremely upsetting to Mrs. Gentile who has undergone therapy to help her cope with the loss.
Mrs. Josie Johnston also had a close loving relationship with her mother. In 1987, Ms. Gordon had spent the Christmas holidays with Mrs. Johnston's family in Dallas. Ms. Gordon attended weddings, graduations and her grandchildren's births in Dallas and even vacationed with the Johnston family on several occasions.

APPLICABLE LAW
In a medical malpractice action against a hospital, the plaintiff must prove, as in any negligence action, that the defendant owed the plaintiff a duty to protect against the risk involved, that the defendant breached that duty, that the plaintiff suffered an injury, and that the defendant's actions were a substantial cause in fact of the injury. Smith v. State of Louisiana Through the Dept. HHR, 523 So.2d 815 (La.1988).
Hospitals in Louisiana are required to render emergency services to all persons residing in the territorial area regardless of insurance or economic status. See LSA-R.S. 40:2113.4. Furthermore, a hospital is bound to exercise the degree of care toward a patient that his or her condition requires, which must be determined under the particular facts and circumstances. Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La. 1986).
A determination of whether a hospital has breached those duties depends upon the facts and circumstances of each particular case. Hunt v. Bogalusa Community Medical Center, 303 So.2d 745 (La.1974). We are cognizant of the standard of appellate review used to review findings of fact. A court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989). Thus to reverse a trial court, the appellate court must find from the record that a reasonable factual basis does not exist for the finding, and further that the finding is clearly wrong. Mart v. Hill, 505 So.2d 1120 (La. 1987). Although the standard of review is high it does not require this court to abdicate its responsibility to review the trial court's findings, nor does it require this court to rubber stamp a jury's answers to interrogatories which are manifestly erroneous.

Jury Interrogatories
Question number two of the jury verdict form read:
Have the plaintiffs established by a preponderance of the evidence that the nurses and attendants at Willis Knighton Medical Center either lacked the degree of knowledge or skill or failed to use reasonable care and diligence along with their best judgment in the application of that skill at *998 the time they rendered medical services to Elizabeth Gordon?
The jury checked the word "No" and did not answer any interrogatories pertaining to causation or damages. In short, the jury determined there was not a breach of the standard of care. This finding is manifestly erroneous. In Hastings, supra, the Louisiana Supreme Court stated some acts of malpractice can be judged by a common sense standard.
In the instant case, a hospital emergency room received a patient that had been transported by ambulance, placed that patient in a room, and then twice informed the patient's family that she was not there. Additionally, five doctors, including one who is board certified in cardiology and another who is recognized as an expert in emergency medicine, testified it was a breach of the standard of care for the nursing staff to discontinue oxygen. Furthermore, every medical expert testified that Ms. Gordon should have been attached to a heart monitor and that the heart monitor should have been continuously observed by one of the three methods outlined above. Assuming arguendo, Ms. Gordon was attached to a monitor, Willis Knighton did not have telemetry, and the monitor to which Ms. Gordon was attached did not have a functioning alarm. Finally, the evidence does not reflect that anyone observed the monitor, except for Nurse Gay who admittedly was only in the room for 2-3 seconds, prior to Ms. Gordon's death. Even Nurse Overstreet stated an unwatched monitor did little, if any, good. Moreover, it is undisputed that the manner in which the medical records were altered fell below the accepted protocol for "correcting" medical records. Even if we were to give Willis Knighton the benefit of every doubt, Willis Knighton breached the standard of care owed to Ms. Gordon, and the jury was manifestly erroneous in finding otherwise.

CAUSATION
Once a breach of duty constituting malpractice is established, the question of whether the malpractice contributed to the death, i.e. lessened the chance of survival, is a question for the fact finder. When the entire record is before the appellate court, remand for a new trial produces delay of the final outcome and congestion of crowded dockets while adding little to the judicial determination. Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975). Accordingly this court has the jurisdiction to decide the case on the record before it. See Leyva v. Iberia General Hospital, 94-0795 (La. 10/17/94), 643 So.2d 1236.
The plaintiff need not show that the decedent would have survived had she received the appropriate treatment for a cardiac patient; rather, the plaintiff need only show that the decedent had a chance of survival which was denied as a result of the defendant's negligence. Hastings, supra, at 720; Smith v. State, 26,280 (La.App.2d Cir. 12/9/94), 647 So.2d 653.
Dr. Hernandez testified that cardiac patients had an improved chance of survival when there was immediate intervention following a cardiac event. The failure of Willis Knighton to monitor Ms. Gordon properly resulted in their inability to provide immediate intervention, and lessened her chance of survival. Dr. Hernandez testified that Ms. Gordon had a less than a 2% chance of survival "at the point she had a respiratory cardiac arrest." However, we note Dr. Hernandez did not comment on what Ms. Gordon's chance of survival would have been if she had not gone into respiratory cardiac arrest. The evidence indicated that proper monitoring and treatment, such as the administering of oxygen and other drugs might have prevented respiratory cardiac arrest. Dr. Cash testified that if the arrhythmia had been detected earlier, it could have been treated; thereby hopefully preventing a respiratory cardiac arrest. Dr. Cash stated:
If all possible medical care would have been available at the moment she collapsed, she still would have a poor prognosis and at least a 50% percent chance of dying regardless of the quality of her care. The only exception I'm indicating is that some people flip PVC's or other irregular rhythms, as Dr. Fair indicates, giving us a signal that a collapse is imminent and allowing us to give medication, such as Xylocaine, *999 which can prevent that collapse. And that's the whole reason people are monitored in the ambulance and in the emergency department.
Although every doctor testified that Ms. Gordon would have had an increased chance of survival if she had been properly monitored, the only doctor to testify concerning her chances of survival before she collapsed was Dr. Michael Reed, the board certified cardiologist. The record is clear that the chance of survival testified to by Drs. Hernandez (2%), Cooper ("very, very small.") and Cash (50%) refer to Ms. Gordon's chance of survival after she went into respiratory cardiac arrest. Dr. Reed testified, without contradiction, that if Ms. Gordon had been properly monitored she would have had a 90% chance of survival. The reason for the great disparity in percentages is because Dr. Reed based his number on Ms. Gordon's chance of survival if she had not collapsed. Dr. Reed's testimony is bolstered by the above quote from Dr. Cash who stated the purpose in monitoring a cardiac patient is to prevent cardiac arrest.
It is undisputed that Ms. Gordon should have been classified as an urgent cardiac patient and as such should have been given oxygen, attached to a heart monitor and continuously observed. It is also undisputed that for a minimum of ten minutes Ms. Gordon was left unattended. After reviewing the entire record, we conclude it was a longer period of time; nonetheless, leaving her unattended for the shorter period of time was still a breach of the standard of care. The risk assumed by leaving Ms. Gordon unattended was that her heart would begin to beat irregularly and no one would be alerted, thereby making timely treatment impossible. We are not persuaded by Willis Knighton's contention that Leonard's cries for help sufficiently alerted the staff. Assuming Ms. Gordon was attached to a monitor, Leonard was not trained to interpret the printout and could not know his mother was deteriorating until she lost consciousness. Furthermore, when an emergency room heart monitor alarm sounds, time is not lost by nurses having to inquire of family members which patient is in trouble. When Dr. Reed entered Ms. Gordon's room she was suffering from an irregular heartbeat which might have been avoided had she been given oxygen, and the irregularity almost certainly would have been detected and treated sooner if she had been properly monitored. Although Ms. Gordon's chance of survival was drastically reduced once she had a respiratory cardiac arrest, that is not dispositive of a determination of her chance of survival. The appropriate percentage to consider is what would have been her chance of survival if Willis Knighton had not breached the standard of care. Dr. Reed testified that a cardiac patient who has suffered a heart attack, but arrives at the emergency room alive, has a 90% survival rate. Because Dr. Reed was the only expert to offer testimony concerning Ms. Gordon's chance of survival before she collapsed, we find that Ms. Gordon would have had a 90% chance of survival if not for the medical malpractice committed by Willis Knighton.

MEASURE OF DAMAGES
Once it has been determined that the trier of fact is clearly wrong, the appellate court is empowered by LSA-C.C.P. Art. 216 to render any judgment which is just, legal and proper. Courts of appeal may award damages when the trial court initially rejects plaintiff's demands and where the record contains sufficient proof of damages. In making an initial award of damages at the appellate level, we are not limited to an award of either the lowest or highest amount we would affirm. Instead, we set the award in an amount which is just compensation for the damages revealed by record. Beckham v. St. Paul Fire & Marine Ins., 614 So.2d 760 (La.App.2d Cir.1993) (citations omitted).
In Smith v. State, 26,280 (La.App.2d Cir. 12/9/94), 647 So.2d 653, this court analyzed the proper method for measuring damages in a loss of a chance case. This court quoted with approval from Professor King's law review article which set forth an eerily familiar hypothetical.
Consider a patient who suffers a heart attack and dies as a result. Assume the defendant-physician negligently misdiagnosed the patient's condition, but that the *1000 patient would have had only a 40% chance of survival even with a timely diagnosis and proper care. Regardless of whether it could be said that the defendant caused decedent's death, he caused the loss of a chance, and that chance-interest should be completely redressed in its own right. * * * [T]he plaintiff's compensation for the loss of the victim's chance of surviving the heart attack would be 40% of the compensable value of the victim's life had he survived (including what his earning capacity would otherwise have been in the years following death). The value placed on the patient's life would reflect such factors as his age, health and earning potential, including the fact that he had suffered the heart attack and the assumption that he had survived it. The 40% computation would be applied to that base figure. King, Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences, 90 Yale L.J. 1353, 1382 (1981) (footnote omitted).
In Smith, supra, this court held the percentage probability of loss, if less than 50%, is the proper measure of the plaintiff's damages in a case of wrongful death due to medical malpractice. Although the analysis and holding in Smith, supra, were used in measuring the damages of an individual with less than a 50% chance of survival, we believe the majority rule is rational and equitable in all cases of loss of chance. By its very nature a loss of chance case precludes one from finding that the defendant's negligence was the sole cause of the plaintiff's demise. Accordingly, the plaintiff's recovery should be reduced by the percentage of probability that she would have died even if the hospital had not committed malpractice.

QUANTUM
The three major children of Elizabeth Gordon seek damages for the wrongful death of Ms. Gordon. The elements of damage for wrongful death are loss of love and affection, loss of services, loss of support, medical expenses and funeral expenses. Cannon v. Cavalier Corp., 572 So.2d 299 (La.App.2d Cir.1990); Watson v. C.R. Bard, Inc., 557 So.2d 739 (La.App.2d Cir.1990).
The record reveals Ms. Gordon was an active 76-year-old grandmother described by her family as "always on the go." Ms. Gordon was close to all of her children, but perhaps closest to her son who lived in Shreveport. Ms. Gordon was very active in the lives of Leonard and his children. She attended bowling matches, ball games and helped care for her grandchildren. Exemplary of the close relationship Ms. Gordon had with Leonard and his children is the fact that the day of her death Terri Gordon and the grandchildren took a Valentine card and candy to Ms. Gordon.
Ms. Gordon was also active in the lives of her two daughters and their families. In 1987 Ms. Gordon had spent Christmas and the following week with her daughter, Josie Johnston, in Dallas. Ms. Gordon also drove to Dallas for graduations, births and other special occasions. Again highlighting the special relationship of Ms. Gordon and her daughter, Josie Johnston, Josie stopped while traveling through Shreveport to visit her mother on the day of her death before continuing on to see her husband's family in Arcadia.
When Mary Ann Gentile was notified over the phone of Ms. Gordon's death she collapsed. Mrs. Gentile testified her mother's death had resulted in her seeking professional counseling. Furthermore, the death of her mother had deeply affected her marriage and her family life.
In Thomas v. State Farm Ins. Co., 499 So.2d 562 (La.App.2d Cir.1986) this court stated that wrongful death awards to major children range from $20,000 to $75,000 with no specific concentration. The Thomas case is now ten years old, and although it has recently been cited with approval, we would be remiss in not factoring in inflationary scales that affect every aspect of our lives. Furthermore, the most recent jurisprudence indicates an increase in awards to major children.
In Faucheaux v. Terrebonne Parish Government, 625 So.2d 683 (La.App. 1st Cir. 1993), a 53-year-old man died of a heart *1001 attack following a boating accident. His 26-year-old son who was self-sufficient and residing on his own was awarded $100,000 for the wrongful death of his father.
In Rick v. State through DOTD, 619 So.2d 1149 (La.App. 1st Cir.1993); modified on other grounds, 630 So.2d 1271 (La.1994), a woman in her late fifties died in an automobile-train accident and her four major children were awarded $150,000 each for the wrongful death of their mother with whom they had a close and loving relationship.
In Mathieu v. State DOTD, 598 So.2d 676 (La.App.3d Cir.1992), a 61-year-old man died in an auto accident and his two major children received $250,000 each for the wrongful death of their father.
In Riser v. American Medical International, Inc., 620 So.2d 372 (La.App.5th Cir. 1993), at 69-year-old woman died as a result of medical malpractice and her three major children each received $100,000 for her wrongful death.
Because of the close loving relationship between Ms. Gordon and her children we award Leonard Gordon $125,000. Mary Ann Gentile and Josie Johnston are each awarded $100,000 for the wrongful death of their mother. These awards are subject to a 10% reduction representing the probability that Ms. Gordon would have died even if Willis Knighton had not committed malpractice.

SURVIVAL ACTION
A court may award damages for the pain and suffering of the decedent where there is the smallest evidence of pain on the part of the victim, by his actions or otherwise. Cannon v. Cavalier Corp., 572 So.2d 299 (La.App.2d Cir.1990).
In Ly v. State of Louisiana through the Department of Public Safety and Corrections, 633 So.2d 197 (La.App. 1st Cir.1993), decedent's car stalled on the interstate and was struck from behind by another vehicle. The impact of the collision propelled decedent's car into the right retaining wall and the car burst into flames. The medical experts testified that decedent did not burn to death; therefore, she died sometime after the first collision but before the fire. An admittedly short period of time. The trial court awarded and the appellate court affirmed an award of $50,000 for her pain and suffering.
In Jones v. Payton, 548 So.2d 1260 (La. App. 4th Cir.1989), a woman, involved in an automobile accident, suffered for thirty to ninety seconds before losing consciousness and dying. The trial court awarded, and the court of appeal affirmed, an award of $50,000 for her pain and suffering.
Ms. Gordon began suffering such severe chest pain and shortness of breath that friends summoned emergency medical personnel. Paramedics attempted to relieve Ms. Gordon's discomfort by placing her on oxygen before transporting her to Willis Knighton. However, upon arrival at Willis Knighton, the nursing staff removed Ms. Gordon's oxygen and failed to alert a physician concerning her chest pain. Ms. Gordon continued to suffer from chest pain for a minimum of twenty minutes, during at least one-half of that time she was unattended by medical personnel despite requests from her family, before lapsing into unconsciousness. When Dr. Reed entered her room Ms. Gordon was gasping for breath but unable to breathe. If Willis Knighton had sustained Ms. Gordon on oxygen and alerted the doctor that she was suffering from chest pain, a large portion of her suffering could have been prevented.
If properly treated by Willis Knighton, this 76-year-old grandmother who was always on the go would have had a 90% chance of survival. Considering her age, health, (including the fact that she had suffered a heart attack) and lifestyle, we award Ms. Gordon $60,000 for her pain and suffering.

CONCLUSION
For the reasons expressed, the judgment dismissing plaintiffs' suit is reversed and judgment is rendered herein as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the plaintiff, Leonard Gordon, individually, and against the defendant, Willis Knighton Medical Center, in the full sum of One Hundred Twelve Thousand and Five hundred ($112,500) dollars, together with legal *1002 interest thereon from the date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of Josie Johnston, individually, and against the defendant, Willis Knighton Medical Center, in the full sum of Ninety Thousand ($90,000) dollars, together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of Mary Ann Gentile, individually, and against the defendant Willis Knighton Medical Center, in the full sum of Ninety Thousand ($90,000) dollars, together with legal interest thereon from the date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the Succession of Elizabeth Gordon, and against the defendant Willis Knighton Medical Center, in the full sum of Sixty Thousand ($60,000) dollars, together with legal interest thereon from the date of judicial demand until paid.
Trial court costs of $3,262.10 together with appellate costs are assessed against appellee, Willis Knighton Medical Center.
REVERSED and RENDERED.
Before NORRIS, HIGHTOWER, BROWN, WILLIAMS, JJ., and EDWARDS, J., Pro Tem.

ORDER ON REHEARING
As counsel of record in the above captioned case, you are hereby notified that the application for rehearing filed by Defendant/Appellee has this day been DENIED.
NORRIS, J., votes to deny the rehearing application and assigns written reasons; WILLIAMS, J., votes to deny the rehearing application for the reasons assigned by Judge NORRIS; and BROWN, J., would grant the rehearing application and assigns written reasons.
NORRIS, Judge, votes to deny rehearing.
I vote to deny the defendant's rehearing application, which urges that this court erred in finding it liable for causing any loss of chance of survival. The authority for granting a rehearing, La.C.C.P. art. 2166, is analogous to the authority for granting an appeal, La.C.C.P. art. 2133. Under the latter, we cannot grant relief to a party who neither appealed nor answered the appeal. See, e.g., First Continental Leasing Corp. v. Howard, 618 So.2d 642 (La.App. 2d Cir.1993).
However, had the plaintiff applied for rehearing, and alleged that the loss of a 90% chance of survival entitles him to 100% of damages, I would have voted to grant, under the rationale of Smith v. State, DHH, 26,280 (La.App. 2d Cir. 12/9/94), 647 So.2d 653, writ granted, 95 0038 (La. 3/10/95), 650 So.2d 1167.
BROWN, Judge, would grant rehearing.
I would grant a rehearing for the limited purpose of correcting an error of substance in the original decision. In Smith v. State, 26,280 (La.App.2d Cir. 12/09/94), 647 So.2d 653, we recognized the right to recover damages in a medical malpractice death case for the loss of a less-than-even chance of survival. The measure of damages in such cases is the determination of the full value for the wrongful death and survival claims and the award of a percentage of that in proportion to the probability of loss.
When a plaintiff, however, has lost a 50% or better chance of survival, full damages, rather than a percentage, should be awarded. Common sense dictates that conduct depriving a person of a 90% chance of survival is the probable cause of death.
This court in Daly v. Abramson, 117 So.2d 772 (La.App. 2d Cir.1959), stated:
... The position taken (that neither defendant nor Zuzak applied for a rehearing) is untenable. The rehearing, although granted on plaintiff's application, was without limitation or restriction. Our original decree was therefore set aside in its entirety and all the issues were again before us for adjudication as they were on the original hearing.