700 So.2d 1141 (1997)
Sheila WEBB
v.
TULANE MEDICAL CENTER HOSPITAL and Abe Andes, M.D.
No. 96-CA-2092.
Court of Appeal of Louisiana, Fourth Circuit.
October 1, 1997.
Rehearing Denied November 14, 1997.
Stewart E. Niles, Jr., Michelle A. Bourque, Amy M. Winters, Jones, Walker, Waechter, Poitevent, Carrere and Denegre, LLP, New Orleans, for Defendants/Appellants The Administrators of the Tulane Educational Fund, d/b/a Tulane Medical Center Hospital and Clinic, and Abe Andes, M.D.
Joseph W. Thomas, New Orleans, for Appellee.
Amy M. Winters, Jones, Walker, Waechter, Poitevent, Carrere and Denegre, LLP, *1142 New Orleans, for Intervenor/Appellant The La. Patients' Comp. Fund Oversight Board.
Before KLEES, LOBRANO and MURRAY, JJ.
LOBRANO, Judge.
In this medical malpractice case, Tulane Medical Center (TMC) appeals the trial court judgment finding it at fault for "nursing negligence" and awarding Ms. Sheila Webb, the mother of decedent, Rodney Comeaux, damages for his death. Ms. Webb answered the appeal complaining the trial court erred in dismissing her claim against Dr. Andes, the treating hematologist, and finding the decedent 20% at fault because of his initial refusal of a blood transfusion.[1]
Mr. Rodney Comeaux passed away on July 21, 1988 at the age of 23. Six months after birth he was diagnosed with Sickle Cell Anemia (SCA), an incurable genetic abnormality of the blood. Throughout his short life, Mr. Comeaux was in poor health suffering from continual bouts of pneumonia and sickle cell crisis.
In June of 1988, Mr. Comeaux had complaints of chest and stomach pain. On June 30, 1988 he was admitted to TMC by Dr. Andes, the medical director of TMC's SCA clinic.[2] He was x-rayed and treated with intravenous antibiotics and pain medication. He was discharged on July 6, 1988 with a prescription for Keflex, an oral antibiotic, and with instructions to see Dr. Andes at 2:30 p.m. on July 12, 1988. On the discharge papers, Dr. Andes listed the diagnosis as pulmonary infarction versus pneumonia.
On the morning of July 12, 1988, several hours before his scheduled appointment, Mr. Comeaux presented at the SCA clinic complaining of chest pain and asked to see Dr. Andes. Dr. Andes was attending patients with previously scheduled appointments and was not able to see him at that time. Mr. Comeaux then went to his mother's office and advised her of his complaints. Ms. Webb, the Deputy Director of Health for the City of New Orleans at that time, worked with Dr. Brobson Lutz, an internist at Charity Hospital. Dr. Lutz took Mr. Comeaux to TMC's emergency room at about 12:15 p.m. Mr. Comeaux was complaining of shortness of breath and chest pain. He was diagnosed with multiple pulmonary infarctions in both lungs and was admitted to a hospital room.
At about 4:00 p.m. Dr. Andes examined Mr. Comeaux in the hospital room. Dr. Andes advised that a Packed Red Blood Cell (PRBC) transfusion was necessary to improve his blood's oxygen carrying capacity. However, the evidence strongly suggests, and the trial court found, that Mr. Comeaux refused the transfusion at that time because of fear of the HIV risk.
The next day, July 13, 1988, Mr. Comeaux's temperature steadily increased and he was coughing up thick, yellow sputum. He was seen by Dr. John Hill, a pulmonologist, who suspected pulmonary infarction with pneumonia and ordered testing on the sputum, as well as chest x-rays. According to Dr. Andes, the antibiotics were having little effect on the chest pain and fever. Late in the afternoon of July 13, 1988, Mr. Comeaux agreed to a transfusion.
Dr. Andes ordered the transfusion of two units of PRBC. The transfusion began at 12:45 a.m. on July 14, 1988 and was completed sometime after 8:00 a.m. Around 4:00 a.m. Mr. Comeaux's temperature was noted at 103.8°F. Dr. Andes saw Mr. Comeaux at 8:30 a.m. His condition was basically the same with chest pain and shortness of breath.
Mr. Comeaux's temperature was 103.2°F at 12 noon. Because of his continued chest and stomach pains, as well as labored breathing, Dr. Andes ordered a check of arterial blood gases (ABG). ABG's were drawn at 12:50 p.m. At approximately 1:00 p.m. Mr. Comeaux suffered a cardiopulmonary arrest. Kimberly Morgan was visiting Mr. Comeaux at the time. She immediately called for help. After 30-35 minutes of effort by the code *1143 team, Mr. Comeaux was resuscitated. However, he remained comatose, suffered irreparable brain damage and was placed on life-support. On July 21, 1988 he passed away when removed from life-support. The trial judge concluded, and no one disagrees, that Mr. Comeaux's cardiopulmonary arrest was brought on by "aspiration vomitus," the inhalation of his vomit.
This litigation started with a medical review panel finding of no negligence on either Dr. Andes or TMC. The panel concluded that Mr. Comeaux suffered the natural consequences of SCA. Plaintiff's lawsuit then was tried to a judge over a period of eleven days in February and March of 1996. In extensive written reasons, the trial judge exonerated Dr. Andes from any liability, but found TMC at fault for "nursing negligence." With respect to TMC's fault, the court's finding was based on the following reasons:
(1) Dr. Seiler testifies that once one hangs blood, the patient should be physically monitored every 20 minutes with an occasional expansion to 30 minutes during the period of transfusion of blood. Failure to do so is a breach of the standard of care.
(2) The nursing notes and charting do not establish the regular and periodic attendance of Comeaux as required by his condition and presentation. That is, Comeaux was not adequately monitored once the transfusion began. In support of this conclusion, the Court references page 301 of the Tulane Medical Center record. Further, the Court notes that Comeaux's temperature hovered around 104° Fahrenheit roughly from the period that the transfusion began until the moment of his arrest. Comeaux's aspirational rate hovered at dangerously high levels during the entire period. There is a want of information indicating that he was monitored between 10:00 a.m. and the time of his arrest. Given the body temperature, aspiration rate, and Comeaux's condition of either pulmonary infarct and/or acute chest syndrome, [Comeaux] warranted more frequent and adequate nursing and monitoring by the Tulane nursing staff.
(3) Although Andes states that the nursing staff complied with the protocol of Tulane, and, thus, met the standard of care, the Court embraces Dr. Seiler's testimony on point as being more accurate.
(4) Lutz testifies that Comeaux was not adequately monitored.
(5) Paragraphs 4 and 5 of the petition are broad enough to cover the issue of nursing staff fault.
This finding is the subject of TMC's appeal.
With respect to plaintiff's claim against Dr. Andes, the court reasoned:
It is the opinion of the Court that Andes did not breach the standard of care for a hematologist. The evidence establishes that a diagnosis of pulmonary infarct was reasonable. Although the Court believes that Comeaux had acute chest syndrome, the line between acute chest syndrome and pulmonary infarct is not so great as to make the diagnosis extremely meaningful in the overall treatment and care of Comeaux. That is, the evidence establishes that a transfusion of PRBC is an appropriate treatment for someone suffering from either pulmonary infarct or acute chest syndrome.
This finding, as well as the finding of 20% fault on the part of Mr. Comeaux for refusing a transfusion, is the subject of plaintiff's answer to TMC's appeal.

TMC'S APPEAL:
TMC argues three errors. First it complains that plaintiff failed to prove either the standard of care for a nursing staff or a breach thereof by TMC's nurses. Second, it argues that there is no evidence of causation. Third, it asserts that the trial judge abused his discretion in eliciting testimony from defendants' experts about the nursing standard of care when plaintiff did not allege nursing negligence in her petition nor make any attempt to prove it in her case-in-chief. We find merit in TMC's lack of causation argument, and thus pretermit consideration of arguments one and three.[3]
*1144 In any medical malpractice case, the plaintiff bears the burden of proving not only the standard of care for the defendant health care provider and the breach of that standard, but also that the plaintiff's injuries were the proximate result of that breach. La. R.S. 9:2794 A. The trial court found Tulane liable only on the grounds of nursing negligence. Although inadequate nursing was not a theory aggressively pursued by plaintiff, evidence was presented that suggested an appropriate standard of care and a potential breach of that standard in this case. However, the record is totally absent of any evidence that this breach caused Mr. Comeaux's fatal arrest.
Plaintiff asserts that Mr. Comeaux was deprived of a chance of survival because he inhaled his own vomit, leading to an eventually fatal arrest, and that the nurses were not closely monitoring him to minimize the risk of aspiration. When a patient dies, as in this case, the plaintiff does not have to prove that death would have been averted but for defendant's negligence, but only that the patient was deprived of a chance of survival. Smith v. State Through Dept. of HHR, 523 So.2d 815 (La.1988). Plaintiff argues that Mr. Comeaux was never given the chance to realize the benefits of Dr. Andes' treatment because of his fatal arrest, and thus lost his chance of survival.
Plaintiff states that the record supports Mr. Comeaux's lost chance of survival, and likens the present case to Gordon v. Willis Knighton Medical Center, 27,044 (La.App. 2 Cir. 6/21/95), 661 So.2d 991, writ denied, 95-2776, 95-2783 (La.1/26/96), 666 So.2d 679. In Gordon, a heart attack patient was completely unattended and unmonitored for a considerable amount of time, during which her condition deteriorated. She received medical attention only after her son discovered her in a room, only minutes before she went into fatal cardiac arrest. Plaintiff suggests that Mr. Comeaux was left with a similar lost chance for survival due to the inattention of TMC's nursing staff.
While we readily agree that Mr. Comeaux's sudden arrest prevented him from reaping the benefits of Dr. Andes' treatment, this does not end our inquiry in this case. His cardiopulmonary arrest undoubtedly eliminated any chances he had for recovery. However, the issue before us is whether there is a causal connexity between the failure to monitor and Mr. Comeaux's respiratory arrest.
Although expert testimony is not always necessary for a plaintiff to carry his burden in a malpractice claim, the causal connection in such a complex medical case is not within the province of lay persons to assess. See Pfiffner v. Correa, 94-0924, 0963, 0992 (La.10/17/94), 643 So.2d 1228. The record before us demonstrates how complex the medical issues are in this case; however, the record is barren of any evidence, expert or otherwise, that any inadequate monitoring caused or contributed to Mr. Comeaux's fatal arrest.
Defendants strongly protest the finding of nursing negligence; they suggest that the standard of care was never properly articulated, and the breach of that standard was not conclusively proven. Dr. Seiler testified that the medical records suggested that the nursing staff adequately monitored Mr. Comeaux throughout his treatment at TMC. Dr. Brammer testified about her review of the nursing notes; these detailed observations of the patient, vital signs, and times at which blood was hung. Dr. Brammer considered this evidence that Mr. Comeaux was being well supervised. However, for our purposes, we need not address this testimony; we will assume that the standard of care in such situations is to monitor patients every 20 to 30 minutes, and that the nurses at Tulane failed to monitor Mr. Comeaux that frequently.
The trial court found that the cause of Mr. Comeaux's cardiopulmonary arrest was "aspiration vomitus," or the inhalation of vomit *1145 into the lungs. Dr. Andes testified that aspiration, although not rare in patients suffering from similar symptoms as Mr. Comeaux, is very sudden; at trial, he agreed that aspiration vomitus is very unpredictable and cannot be foreseen. Plaintiff offered no testimony to counter Dr. Andes's statement.
TMC argues that the conduct of the nursing staff did not in any way precipitate Mr. Comeaux's aspiration and following arrest, and supports this argument with expert testimony offered at trial. Dr. Seiler specifically testified that even a total lack of monitoring would have had nothing to do with Mr. Comeaux's ultimate respiratory arrest. He was joined in this conclusion by Dr. Brammer, who testified that no act by the nurses or nursing personnel caused or contributed to the patient's acute sudden respiratory arrest.
In contrast to the testimony presented by defendants, plaintiffs have failed to present any evidence, in the form of expert testimony or otherwise, which supports a causal link between inadequate monitoring and Mr. Comeaux's fatal arrest.
The trial judge inferred a causal connection nevertheless, reasoning that "common sense tells us that one who is coughing up sputum will likely ingest significant quantities" and thus greater observation was warranted. However, in the absence of any supporting evidence, that common sense reasoning cannot be extended to satisfy plaintiff's burden of proof that inadequate observation caused or contributed to Mr. Comeaux's cardiopulmonary arrest. Common sense alone cannot tell the lay person what would have been the consequences of more frequent monitoring, and the record contains no evidence which suggests what could have been done even if a nurse had been seated at his bedside prior to the arrest. Plaintiff has failed to offer any proof that more immediate assistance would have prevented the catastrophic results of his aspiration.
Based on the evidence in this record, we conclude that more frequent monitoring would have made no difference. Mr. Comeaux would have aspirated even had he been monitored in accordance with the standard established by the court. We reach that conclusion because of the absence of evidence to the contrary. We hold that the trial judge's inference of causation is not supported by the evidence, and in this case is beyond the province of a lay person.
Finally, plaintiff's reliance on Gordon v. Willis Knighton Medical Center, supra, is ill-placed; that case actually supports our holding. In Gordon, an abundance of expert medical testimony supported the causal link between the unattended heart attack victim and her premature demise. She was deprived of the opportunity to receive treatment (her chance of survival) because she was placed in a room and totally forgotten. In this case there is no expert evidence to substantiate that Mr. Comeaux was deprived of further treatment because of inadequate monitoring by TMC's nurses. Accordingly, we reverse the finding of liability on the part of TMC.

PLAINTIFF'S APPEAL:
Plaintiff argues the trial judge erred in dismissing her claim against Dr. Andes. Specifically, she asserts that Mr. Comeaux's deteriorated condition warranted a partial blood exchange rather than a simple transfusion and that the trial judge failed to recognize this. She argues that Dr. Andes breached the applicable standard of care in his treatment of Mr. Comeaux. The thrust of her position is that Dr. Andes' diagnosis of pulmonary infarct rather than acute chest syndrome resulted in the simple transfusion rather than a partial exchange. The trial judge rejected plaintiff's argument by concluding that "the evidence establishes that a transfusion of PRBC is an appropriate treatment for someone suffering either pulmonary infarct or acute chest syndrome." In sum, the trial judge relied on the opinions of Drs. Brammer, Caputto and Seiler, and rejected those of Drs. Rodgers, Lutz, Haynes and Frempong. We find no basis to disturb that credibility evaluation. The conclusions of each are reasonable, and where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State through DOTD, 617 So.2d 880 (La. 1993).
*1146 Plaintiff bore the burden of proving Dr. Andes breached the applicable standard of care in his treatment of Mr. Comeaux. Dr. Andes is a hematologist; a specialist. "[W]here the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty." La. R.S. 9:2794 A(1). Dr. Rodgers' testimony is the basis of plaintiff's argument as to the standard of care and Dr. Andes' breach thereof. We review that testimony.
Dr. Griffin Rodgers was qualified as an expert in internal medicine, hematology, emergency medicine and sickle cell disease. His opinion was that the standard of care was breached by Dr. Andes three times in the treatment of Mr. Comeaux in the period of June-July, 1988. Those three violations, according to Dr. Rodgers, were 1) failure to recognize acute pulmonary infarction on July 6, 1988, 2) failure to recognize acute chest syndrome on July 12, 1988 and 3) failure to diagnose and appropriately treat acute chest syndrome on July 12, 1988 and July 13, 1988.
Dr. Rodgers stated that if Mr. Comeaux had been his patient, he would probably have instituted a partial exchange transfusion because Mr. Comeaux's hemoglobin level was extremely high. He said that a simple transfusion only requires the use of type and cross matching of blood and the infusing of anywhere from one to several units of blood through the vein. With a partial exchange transfusion, the intent is to remove the patient's blood and to replace it in part with donor blood. Either procedure can be done on an outpatient basis.
When reviewing Dr. Andes' discharge instructions of July 6, 1988 to Mr. Comeaux, Dr. Rodgers said that instead of stating that there were no symptom problems requiring notation, he would have made a notation and told the patient that if he experienced continued pain, shortness of breath, fever, etc., then he should see a physician prior to the appointment scheduled for July 12, 1988. He also would have considered doing an exchange transfusion on the date of discharge because there was good evidence of concomitant pneumonia and pulmonary infarction. Dr. Rodgers' opinion was that the appropriate therapy at the point of these progressive chest symptoms should have been exchange transfusion. He said that was the standard of care in mid-1988.
His opinion was that the failure to do an exchange transfusion on July 12, 1988 in this case was a violation of the standard of care. He opined that Mr. Comeaux would more likely than not have survived if an exchange transfusion had been performed on July 12, 1988. However, he expanded this statement to add that he believed there was still a last chance to do a partial exchange transfusion on Mr. Comeaux on July 13, 1988 and that he would more likely than not have survived if this had been done. His opinion is that it is more likely than not that the simple transfusion therapy as well as the associated fluid management that he got in conjunction with the simple transfusion therapy, i.e. the normal saline that was infused around the time of the therapy, caused him to become fluid overloaded and more likely than not contributed to his cardiopulmonary arrest on July 14, 1988.
According to Dr. Rodgers, Dr. Andes' notes showed that on July 13, 1988, he requested a consult with a pulmonologist for suggestions for treatment of pulmonary infarction in sickle cell disease. Dr. Rodgers reviewed the recommendations of the consulting pulmonologist and was of the opinion that the studies ordered were appropriate therapy for concomitant pneumonia, but not appropriate for treatment of pulmonary infarction. None of the treatments recommended by the pulmonologist related to the treatment of acute chest syndrome. Dr. Rodgers stated that the standard of care in a situation with a patient with acute chest syndrome would require daily chest x-rays until the patient is stabilized. He could not tell from the records if a chest x-ray was obtained on July 13, 1988. He said the records indicated that Mr. Comeaux's condition was deteriorating on July 13, 1988. These indications included pain in both the right and left side of his chest and breathing at an extraordinarily *1147 rapid rate. He said the clinical findings also showed insufficient oxygen in the blood, fever, an elevated white blood count, change in the pattern of the chest x-rays, change in the physical findings and a substantial drop in the hemoglobin value. Dr. Rodgers said these signs were all very indicative and suggestive of acute chest syndrome which calls for immediate exchange transfusion therapy.
However, referring to the book, Blood:Textbook of Hematology by James Jandl, Dr. Rodgers admitted that the section of this book entitled "Pulmonary Manifestations" does not specifically state that partial exchange transfusion is a treatment for acute chest syndrome. It indicates that this type of therapy should be reserved for anemic crises, late stage pregnancy, major surgery and life threatening complications of sickle cell syndrome such as cerebrovascular accidents. Dr. Rodgers interpreted the words "such as" to imply that there are other situations in which partial exchange transfusion is indicated and that cerebrovascular accidents are only meant to be one example. He believes partial exchange is indicated in acute chest syndrome to prevent further respiratory failure. He said this section of the book refers to an article which refers to acute chest syndrome. In a 1988 article co-authored by Dr. Rodgers on the management of sickle cell disease, there is no mention of partial or total exchange transfusions in patients with acute chest syndrome.
Dr. Rodgers admitted that he was not provided with the records of Tulane Medical Center for health care services provided to Mr. Comeaux prior to June 25, 1988. He thinks that the reoccurrence of Mr. Comeaux's symptoms on July 12, 1988, after having been relatively symptom free since his discharge on July 6, 1988, still made it more likely than not that the problems occurring on July 12, 1988 were not an independent event and were related to the previous problems. With regard to his earlier testimony that Dr. Andes failed to recognize acute chest syndrome on July 12, 1988, Dr. Rodgers defined acute chest syndrome as a compilation of factors including fever, leukocytosis, i.e. elevation of white blood cell count, increased infiltrates on the chest x-ray, and a drop in the hemoglobin count. Pulmonary infarct can be an early feature of acute chest syndrome if it is within a differential diagnosis, i.e. the distinguishing between diseases of similar character by comparing their signs and symptoms. He draws a distinction between a diagnosis of pulmonary infarct and one of acute chest syndrome and explained that pulmonary infarct is a very specific anatomic diagnosis whereas acute chest syndrome is related to a compilation of factors. His opinion is that the correct diagnosis of Mr. Comeaux's condition on July 12th was acute chest syndrome rather than the diagnosis of pulmonary infarct made by Dr. Andes. He believes that it is more likely than not that most hematologists, given Mr. Comeaux's history and laboratory findings, would have diagnosed him with acute chest syndrome on July 12th.
Dr. Rodgers concluded that Mr. Comeaux was fluid overloaded on July 14th and one of the factors upon which this conclusion was based was the patient having an accelerated hemoglobin level over a twelve hour period of time. He said this conclusion was based on a number of other factors as well. He said there was clinical evidence of volume overload at the time Mr. Comeaux underwent the simple transfusion. He does not believe the simple transfusion was indicated.
Dr. Johnson Haynes, an expert in pulmonology, opined that Dr. Andes breached the standard of care on July 13, 1988 by not ordering an exchange transfusion. Dr. Hayes said that because Mr. Comeaux's condition was getting progressively worse, it was important to get rid of some of the sickle blood and replace it with normal blood. He testified that Mr. Comeaux's successful treatment with relatively conservative measures in the past did not suggest that the same treatment should be followed when the disease progressed. In sum, Dr. Haynes opined that Mr. Comeaux suffered progressive acute lung failure which necessitated a partial exchange rather than a simple transfusion.
Dr. Kwaku Ohene-Frempong, a pediatric hematologist, opined that by at least the early hours of July 14, 1988, Mr. Comeaux should have been administered a partial exchange *1148 because his condition was worsening. Dr. Frempong testified that in his opinion Mr. Comeaux was suffering acute chest syndrome when he presented at the hospital on June 25, 1988.
In contrast, Dr. Seiler, an expert in hematology, internal medicine and oncology, testified that Dr. Andes' diagnosis of pulmonary infarct on July 12, 1988 was reasonable and that Mr. Comeaux did not require a partial blood exchange prior to the time of his arrest on July 14, 1988. Dr. Seiler testified that partial blood exchanges were very controversial at that time. That therapy was not considered the standard of care because of potential problems such as HIV and hepatitis transmission. It was considered to be research for such life threatening processes as a cerebrovascular accident. Dr. Seiler was not aware of any studies prior to July 1988 which indicated the efficacy, safety or appropriateness of partial blood exchanges for sickle cell patients with pulmonary infarct and/or acute chest syndrome. Prior to July 1988, the only information that had been reported regarding this type of therapy were unrelated, isolated, anecdotal reports. In his opinion, these anecdotal reports did not establish a standard of care for the use of partial blood exchanges in sickle cell patients with either pulmonary infarct and/or acute chest syndrome.
Dr. Seiler explained that, in the book entitled Blood; Textbook of Hematology, there is a mention of exchange transfusions for the treatment of sickle cell anemia but it says that "exchange transfusion is of limited, temporizing value and should be reserved for anemic crises, late-stage pregnancy, major surgery, and life threatening complications of sickle cell syndromes such as cerebrovascular accidents." Nowhere in that discussion is there any statement that partial exchange transfusion has a role in the treatment of pulmonary infarcts and/or acute chest syndrome. His opinion is that Mr. Comeaux did not present "serious complications" between admission on July 12th and the arrest on July 14th which would suggest or even support the notion of partial blood exchange. Dr. Seiler had no criticism of the care received by Mr. Comeaux during his hospitalization. The infusion of packed red blood cells was the standard therapy at that time for pulmonary infarct and/or acute chest syndrome. He said it was not more likely than not that if Comeaux had received packed red blood cells within a few hours of his admission on July 12, 1988, his cardiopulmonary arrest would have been prevented. Dr. Seiler said this was true whether he had received packed red blood cells or partial blood exchange.
Dr. Seiler further opined that it is more likely than not that Mr. Comeaux was not overloaded with fluid at any time on July 14, 1988 prior to his cardiopulmonary arrest. He also opined that Dr. Andes' decision to discharge the patient from the hospital on July 6, 1988 was reasonable and not a deviation from the standard of care. He believes that Dr. Andes properly and appropriately recognized the disease process that the patient had in his evaluation of July 12, 1988. He also believes Dr. Andes' discussions on July 12 and 13, 1988 regarding the use of blood were within the standard of care with regard to treatment options.
Dr. Salvador Caputto[4] reiterated the opinion of Dr. Seiler. In his opinion, the pulmonary infarct diagnosed on July 12th was a new process and unrelated to the pneumonia that occurred during the hospitalization from June 30th to July 6th. He agreed with the therapy instituted by Dr. Andes and thinks it was appropriate for the patient to be placed on fluid therapy. Dr. Caputto stated that the administration of simple transfusions over a long period of time to a sickle cell patient who initially has a pulmonary infarct will more likely than not benefit the patient and prevent the patient's condition from getting worse. He stated that from the time Mr. Comeaux came into the hospital on July 12, 1988 until the time of his cardiopulmonary arrest at approximately 1:00 p.m. on July 14, 1988, he did not show any serious signs or complications that required a type of treatment or therapy different from that which was administered by Dr. Andes.
*1149 Finally, Dr. Melissa Brammer,[5] testified that Dr. Andes acted appropriately in identifying Mr. Comeaux's problem and suggesting a course of therapy. When confronted with a sickle cell patient with pulmonary infarct and/or acute chest syndrome, she has used simple transfusions and has not had any reason to do exchange transfusions since she has been in practice. This included patients treated prior to July 1988. From the records, Dr. Brammer determined that Mr. Comeaux's condition took an acute turn for the worse at the time of the code on July 14th and that this deterioration was sudden and was at variance from his condition prior to that time. Her opinion is that Dr. Andes did not deviate from the standard of care by not performing a partial blood exchange transfusion on July 12th or July 13th. She also opined that Mr. Comeaux's hemoglobin values on July 13th and July 14th did not indicate that the patient was volume overloaded. Her opinion is that the fluid management established by Dr. Andes was very appropriate.
Based on these differing opinions, the trial judge concluded that a simple transfusion was an acceptable treatment for either pulmonary infarct or acute chest syndrome. The court further concluded that the evidence did not support fluid overload. We simply cannot say those conclusions are clearly wrong. Accordingly, we reverse the portion of the judgment holding TMC liable for nursing negligence, and affirm that portion dismissing plaintiff's claims against Dr. Andes.
REVERSED IN PART; AFFIRMED IN PART; RENDERED.
NOTES
[1] The Louisiana Patient's Compensation Fund also appealed and adopted the argument of TMC. For ease of reference, we refer to both appellants as TMC.
[2] Previously, since 1981, Mr. Comeaux had been treated by Dr. Frempong, the then director of the Clinic. Dr. Andes took Dr. Frempong's place sometime in 1986.
[3] The specifics of TMC's arguments one and three are as follows: the trial court utilized the testimony of Dr. Seiler to establish a nursing standard of care which requires monitoring every 15 to 20 minutes. That testimony was elicited by the trial judge. Then relying on the nursing notes and Dr. Lutz's rebuttal testimony, the trial court concluded that there was inadequate monitoring by TMC's nurses. TMC argues that a standard was not proven, that the trial judge should not have elicited the testimony on his own, and that nursing negligence was not alleged in plaintiff's petition.
[4] Dr. Caputto was qualified as an expert in internal medicine, hematology and oncology.
[5] Dr. Brammer was qualified as an expert in hematology, internal medicine and oncology.